NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1013
_____

UNITED STATES OF AMERICA,

Appellant

v.

MICHAEL WOLFE,

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 10-cr-00616-001)
District Judge: Hon. Harvey Bartle, III
_____

Submitted Under Third Circuit LAR 34.1(a)
November 9, 2011

Before: SCIRICA, SMITH, and JORDAN, *Circuit Judges*.

(Filed: November 18, 2011)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

The government appeals from an order of the United States District Court for the Eastern District of Pennsylvania granting Michael Wolfe's motion to suppress. This case arises from a search of Wolfe's home by Philadelphia police officers, which resulted in his indictment for federal drug and firearms offenses. Arguing that the warrantless search violated the Fourth Amendment, Wolfe successfully moved to suppress the evidence the officers took and the statements that he made to them after his arrest. For the following reasons, we will affirm.

I.     **Background**

*A.     Facts*

On the evening of May 3, 2010, Carol Brown dialed 9-1-1 from her home at 912 South Orianna Street in Philadelphia and reported that her son, Wolfe, had been shot in the hand while he was out on the street. A police radio call then went out reporting a "male shot on the highway." Two officers responded within a few minutes and knocked on the door to Brown's home. She admitted them and told them that her son had been shot. The officers found Wolfe sitting in a chair in the living room bleeding profusely from his hand. They questioned him about what happened and whether he knew who had shot him, and Wolfe responded that he had been shot while he was outside. Brown, her daughter, and a neighbor were present in the home while the officers questioned Wolfe. The officers asked Brown whether there were any other individuals in the house, and she

2

told them that there were none. Within a few minutes, the officers assisted Wolfe, who appeared to be fainting, out of the home so that he could receive medical treatment.

As the officers were bringing Wolfe out the front door, a supervising officer, Sergeant Evans, arrived at the scene. Evans observed that Wolfe appeared to be in a great deal of pain, and he authorized the officers to transport Wolfe to a local hospital. He did not, however, communicate with Wolfe, Brown, or the officers about what had happened or whether there was cause for concern that someone still in the home was injured or might pose a threat. After Wolfe was taken to the hospital, Evans entered the home, accompanied by later arriving officers.

As he did so, he observed blood, including a trail of blood that led up the stairs to the second floor and ended at the top of the stairway.[1] Evans and another officer followed the blood trail to the second floor and entered a rear bedroom (later revealed to be Wolfe's), where they saw a clear plastic bag on the bed. Because he immediately believed the bag contained narcotics, Evans secured the property and called the police department to request a search warrant. When the search warrant arrived, the officers entered the bedroom and began a full search, finding crack cocaine, marijuana, and a firearm.

---

[1] Although Evans testified that he could see blood on the carpet inside the home prior to his entry, it is unclear whether he observed the blood through a window, or, if the door was open after the responding officers transported Wolfe out of the house. (*See* App. at 73 ("I could see a lot of blood on the carpeting. … Seeing that blood I went into the property to clear the property.").) Evans testified that the blood trail continued to the bedroom, but the District Court found that the blood stopped at the top of the stairs. The government does not appeal that factual finding, and we accept it as true.

3

After Wolfe was released from the hospital, police took him to a police station for questioning. They informed him of Evans's search and arrested him. Wolfe later made incriminating statements regarding his ownership of the drugs and the gun, and his intent to sell the crack cocaine.

### B. Procedural Background

Wolfe was charged with possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), possession with intent to distribute crack cocaine near public housing, in violation of 21 U.S.C. § 860, possession of marijuana, in violation of 21 U.S.C. § 844(a), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Wolfe was also charged as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Wolfe successfully moved to suppress the drugs and firearm discovered in his bedroom and the incriminating statements that he made to the police after his arrest. The District Court determined that the first responding officers faced an emergency situation which justified their entry into Brown's home. However, the Court also concluded that, after the responding officers escorted Wolfe out of the home,

> there was no immediate or compelling need to insure the safety of the officers or anyone else by entering the second floor beyond the top of the stairs. ... [T]here was no indication, let alone probable cause for a reasonable person to believe, that additional victims existed or that any assailant was present inside [the home].

(App. at 8.) The government filed a timely notice of appeal.

4

## II.   Discussion[2]

We must determine whether Sergeant Evans violated Wolfe's Fourth Amendment rights by searching the second floor of his residence without a warrant. That requires first asking whether Evans's entry into Wolfe's residence was lawful, a matter as to which the government bears the burden of proof.[3] *See Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984) ("[T]he burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries."). The government failed to carry that burden, and, on the facts found by the District Court, we are persuaded that suppression was appropriate.

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). However, the Supreme Court has recognized several exceptions to the warrant requirement. One of those exceptions is that law enforcement officers may enter and search a home under exigent circumstances. *Michigan v. Fisher*, 130 S. Ct. 546, 548

---

[2] We review a District Court's ruling on a motion to suppress for clear error as to the underlying factual findings, and we exercise "plenary review of [a] District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002). We have appellate jurisdiction pursuant to 18 U.S.C. § 3731. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.

[3] The District Court did not expressly decide whether Evans's initial entry into the home was lawful. Rather, the court granted the motion to suppress based on its conclusion that the search of the second floor was unconstitutional. However, because we may affirm on any ground supported by the record, we begin our analysis by examining whether Evans's initial entry into the home was lawful. *Johnson v. Orr*, 776 F.2d 75, 83 n.7 (3d Cir. 1985).

(2009). Exigent circumstances have been found, for example, in situations where emergency aid is required, *see Brigham City v. Stuart*, 547 U.S. 398 (2006), where officers are in "hot pursuit" of a fleeing suspect, *see Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967), and where there is an imminent risk that evidence will be destroyed, *see Ker v. California*, 374 U.S. 23 (1963).

Of particular note here, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 403. However, for the warrantless search to be constitutional, there must be "probable cause and such other circumstances [as] would cause a reasonable person to believe that the 'exigencies of the situation made that course imperative.'" *United States v. Moskow*, 588 F.2d 882, 892 (3d Cir. 1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)). In other words, Evans must have held "'an objectively reasonable basis for believing' ... that 'a person within [the house was] in need of immediate aid.'" *Fisher*, 130 S. Ct. at 548 (quoting *Brigham City*, 547 U.S. at 406; *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)); *see Good v. Dauphin Cnty. Soc. Servs. for Children and Youth*, 891 F.2d 1087, 1094 (3d Cir. 1989) ("[G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat."). "The presence of exigent circumstances is a finding of fact, which we review for clear error." *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006).

6

The government argues that Evans's search was justified under the "exigent circumstances" exception because he reasonably believed that additional victims or threats existed inside Brown's home. Specifically, the government contends that Evans's search was "not only reasonable, but manifestly appropriate and necessary," because he observed "a gunshot victim on the first floor of the house, blood throughout the rooms on the first floor, and a trail of blood leading to the top of the stairs to the second floor," and that he made those observations "moments after a nearby shootout." (Appellant's Opening Br. at 13-14.) The difficulty with that argument is that it ignores the evidence of record and facts found by the District Court. The government had to prove that Evans had an "objectively reasonable basis" for his belief that additional victims or threats existed in Brown's home. The only basis the government asserts is the exigency created by the shooting that wounded Wolfe. But the District Court found as a matter of fact that there was no exigency in the home by the time Evans arrived, and, on this record, we cannot say that finding is clearly erroneous.

The record reveals that the following information was available to Evans when he arrived at 912 South Orianna Street: (1) a dispatch report that a "male [was] shot on the highway," (App. at 52); (2) his observation that two officers were escorting Wolfe, who was bleeding, out of the house; and (3) his observation – somehow made from outside – that there was blood on the carpet in the house. Importantly, however, Evans arrived at the scene after two other officers had already been in the home and addressed the exigency, and none of the evidence available to Evans when he arrived suggested that there was another victim or threat in the home. First, the fact that the dispatch reported a

shooting on the highway does not, on its own, support a reasoned belief that the unknown shooter, or another victim, was inside Wolfe's home. Indeed, while the government portrays the events as a rapidly unfolding and chaotic scene, the testimony shows that the scene was in keeping with the only report available to the police: there was one victim; he was shot on the highway; he returned to his residence, where police officers attended to him; and he was leaving his residence for the hospital with those officers. On these facts, and they are the facts that bind our review, Evans's observation of blood in the house did not create an "objectively reasonable" basis for a belief that the blood belonged to anyone other than Wolfe. There is nothing in the record suggesting that anyone other than Wolfe was wounded or had come into the house that Brown shared with Wolfe. To the extent an emergency existed when the two responding officers first arrived at 912 South Orianna Street, it ceased when they safely transported Wolfe out of the house and to the hospital.

This last point bears strong emphasis. We should not be understood as holding that police officers cannot address ambiguous and evolving circumstances as their well-informed professional judgment dictates. In this case, however, Evans began his search *after* the two responding officers had already resolved the only exigency there was cause to believe existed. It is true that "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception," *Fisher*, 130 S. Ct. at 549 (internal quotation marks omitted), but here, after hearing the evidence, the District Court determined that Evans had no indication that additional victims or threats were inside the home after Wolfe's departure. Though the government disagrees with that interpretation

8

of the evidence, the finding is sufficiently supported to withstand review for clear error.[4]

(App. at 8.)

The government relies heavily on *Mincey v. Arizona*, 437 U.S. 385 (1978), to support its position that the search was lawful under the exigent circumstances exception, but its reliance is misplaced. In *Mincey*, shots were fired inside an apartment during an undercover drug operation, and an officer was killed. *Mincey*, 437 U.S. at 387. After the shooting, officers quickly searched the apartment for additional victims and discovered several wounded occupants. *Id.* at 388. Subsequently, police conducted an extensive, warrantless, four-day search of the entire residence. *Id.* at 389. The Supreme Court held that although the initial search was constitutional under the emergency aid exception, the subsequent four-day search of the house was unlawful. *Id.* at 392-93. The Court explained that,

> a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation,' … and it simply cannot be contended that this search was justified by any emergency threatening life or limb. All the

---

[4] The government asserts that, even if Evans had been informed that no other victims were present, "he would not simply accept that information, but would act to verify it." (Appellant's Reply Br. at 4; *see also* App. at 99.) In other words, the government seems to suggest that an officer's perceived need to "clear" the premises (i.e., conduct a room-to-room search of the entire house to ensure that no other victims or threats are present) is enough to satisfy the demands of the Fourth Amendment. On these facts, the government is mistaken. Although a police officer who arrives at the scene of an ongoing emergency may search a residence to ensure that there are no additional victims or threats, he must have an "objectively reasonable basis" for doing so. *See Fisher*, 130 S. Ct. at 549 (quoting *Brigham City*, 547 U.S. at 406) (noting that the test "is not what [the officer] believed, but whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger.") (internal quotation marks omitted). That basis was lacking here.

9

persons in Mincey's apartment had been located before the investigating homicide officers arrived there and began their search.

*Id.* at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 26 (1968)).

*Mincey* does not support the government's actions in this case because, unlike *Mincey*, in which the officers knew that the crime causing the exigency occurred inside the home, the only information the police had here was that the crime that caused the exigency occurred outside the home and that the single victim had retreated inside. On the facts found by the District Court, there was no foundation for inferring that the perpetrators were inside the residence or that there were other victims there.[5]

Because the government failed to satisfy its burden of proving that Evans had an objectively reasonable basis for his belief that other victims or threats were present in Wolfe's residence, the search he conducted ran afoul of the Fourth Amendment.[6]

**IV.    Conclusion**

For the foregoing reasons, we will affirm the District Court's suppression order.

---

[5] Other cases the parties cite in their briefs are also distinguishable from this one on the same grounds. *See*, *e.g.*, *Fisher*, 130 S. Ct. at 547 (concluding that exigent circumstances existed where officers responded to report that man was "going crazy" at residence, "found a household in considerable chaos," and observed individual acting violently through window); *Brigham City*, 547 U.S. at 406 (finding that exigency existed where officers responded to complaint at residence, heard altercation occurring inside residence, and observed violent acts through window); *Hayden*, 387 U.S. at 298-99 (finding exigent circumstances where officers received report that robber recently fled house).

[6] The government has conceded that if Evans's search of 912 South Orianna Street was unconstitutional, Wolfe's subsequent statements at the police station are the fruit of the poisonous tree, and therefore inadmissible. We therefore need not address whether the District Court erred in granting Wolfe's motion to suppress those statements.