In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2272

KRYSTA SUTTERFIELD,

*Plaintiff-Appellant*,

*v.*

CITY OF MILWAUKEE, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 11-C-0486 — **J. P. Stadtmueller**, *Judge.*

ARGUED OCTOBER 25, 2012 — DECIDED MAY 9, 2014

Before FLAUM, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Krysta Sutterfield sued the City of
Milwaukee and several of its police officers after the officers
forcibly entered her home to effectuate an emergency detention
for purposes of a mental health evaluation, opened a locked
container, and seized for safekeeping the gun and concealed-
carry licenses they found inside. She contends that officers
violated her rights under the Second, Fourth, and Fourteenth

Amendments in doing so. We conclude that the warrantless entry into Sutterfield's home was justified under the exigent circumstances exception to the Fourth Amendment's warrant requirement, as the defendant officers had a reasonable basis to believe that Sutterfield posed an imminent danger of harm to herself. We shall assume, as the district court did, that the search of a closed container for a gun, and the ensuing seizure of that gun, violated Sutterfield's Fourth Amendment rights. But we agree with the district court that even if the officers did exceed constitutional boundaries, they are protected by qualified immunity. *See Sutterfield v. City of Milwaukee*, 870 F. Supp. 2d 633 (E.D. Wis. 2012). We therefore affirm the district court's decision to grant summary judgment in favor of the defendants.

## I.

At around noon on March 22, 2011, Dr. Michelle Bentle, a psychiatrist at Columbia/St. Mary's Hospital in Milwaukee, placed a 911 call to report that Sutterfield had just left an outpatient appointment in her office after expressing suicidal thoughts.[1] Milwaukee police officers Clifton Stephens and Timothy Powers were tasked to respond to the report. They contacted Dr. Bentle, who advised them that Sutterfield, after indicating that she had received some bad news, had remarked, "I guess I'll go home and blow my brains out." Dr. Bentle indicated she was concerned for Sutterfield's safety and that police intervention was warranted. She also informed the

---

[1]  Sutterfield disputes the accuracy of the report, but accepts that this is what the defendant officers were told.

officers that Sutterfield had worn an empty gun holster to her appointment, from which she had surmised that Sutterfield owned a gun.

Over the next few hours, Stephens and Powers were unable to locate Sutterfield. They visited her home, knocked on the front door, but received no response. A neighbor advised them that Sutterfield had left her home that morning in her car and had not returned. The officers checked her garage and the street in front of Sutterfield's residence but did not see the type of car that her neighbor had described.

At 2:45 p.m., Dr. Bentle telephoned the officers to advise them that Sutterfield had called her some minutes earlier stating that she was not in need of assistance and that the doctor should "call off" the police search for her. According to the officers, Dr. Bentle did not indicate that Sutterfield no longer posed a danger to herself.

With the end of their shift approaching, Stephens and Powers prepared a Statement of Emergency Detention by Law Enforcement Officer ("statement of detention") pursuant to Wisconsin Statutes section 51.15. In relevant part, section 51.15 provides that a law enforcement officer may take a person into custody when he has cause to believe that the person is mentally ill and evidences "[a] substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." § 51.15(1)(a)(1). The statute specifies a set of procedures that must be followed in effectuating such a detention. In Milwaukee County, the law enforcement officer must sign a statement of detention which, *inter alia*, "shall provide detailed

specific information concerning the recent overt act, attempt, or threat to act or omission on which the belief under sub[sectio]n (1) [here, that the person poses a danger to himself] is based and the names of the persons observing or reporting the recent overt act, attempt, or threat to act or omission." § 51.15(4)(a). Signing such a statement knowing the information contained therein to be false is deemed a felony offense. § 51.15(12). Upon presenting the individual—along with the statement of detention— to an appropriate treatment facility, the treatment director of that facility (or his designee) must determine within 24 hours whether the individual should be detained for a period of up to 72 hours. § 51.15(4)(b). If the facility determines that the person does not meet the criteria set forth in section 51.20(1)(a) of the Wisconsin Statutes to detain an individual for purposes of an in-patient mental health evaluation (the first step in the involuntary commitment process),[2] the person must be released immediately. *Id.* If the facility director decides to detain the individual, the director may supplement in writing the statement of detention prepared by the law enforcement officer and include other pertinent information indicating that the individual meets the criteria for commitment; the director also must designate whether the individual is, *inter alia*, mentally ill. *Id.* The director must promptly file the original statement, including any

---

[2]   In relevant part, section 52.20(1)(a) requires that a petition seeking such an evaluation allege that the person is mentally ill, drug dependent, or developmentally disabled, and that there is a substantial probability that he may harm himself, as evidenced by recent threats of or attempts at suicide or serious bodily harm.

supplement, along with a notice of detention, with the local probate court. *Id.*

The statement of detention prepared by Stephens and Powers documented the pertinent information that Dr. Bentle had shared with them about Sutterfield and noted their inability to locate her. Both officers signed the statement. At 4:00 p.m., Stephens and Powers went off duty.

Officer Jamie Hewitt of the Sensitive Crimes Division subsequently was assigned to locate Sutterfield. After spending several hours reviewing the paperwork, tracking down information regarding Sutterfield's automobile and having that information issued to Milwaukee patrol officers, and checking with local hospitals to see whether Sutterfield had been admitted, Hewitt and several other officers returned to Sutterfield's residence. Hewitt's intent was to execute the statement of detention if and when she located Sutterfield.

Arriving on Sutterfield's doorstep at approximately 8:30 p.m., Hewitt and the other officers found her at home. Sutterfield answered Hewitt's knock at the front door but would not engage with her, except to state repeatedly that she had "called off" the police and to keep shutting the door on Hewitt. Sutterfield would not admit Hewitt to the residence, and during the exchange kept the outer storm door closed and locked. Unable to gain admittance to the house, Hewitt concluded that the police would have to enter it forcibly. Consistent with police department procedure, Hewitt requested that a supervisory officer be dispatched to the house.

Sergeant Aaron Berken arrived at approximately 9:00 p.m. After Hewitt brought him up to speed on the situation, Berken

knocked at the front door and identified himself as a police officer. As she had with Hewitt, Sutterfield opened the inner door of the house but not the locked storm door; she refused to admit Berken or any other officer into the residence. Sutterfield called 911 in an effort to have the officers leave; as a result of that call, the ensuing events were recorded by the emergency call center. Sutterfield can be heard on the recording telling the officers that she was fine and that she did not want anyone to enter her residence.

After informing Sutterfield of his intention to open the storm door forcibly if she did not unlock it herself, Berken yanked the door open and entered the house with the other officers to take custody of Sutterfield pursuant to the statement of detention. A brief struggle ensued. Sutterfield can be heard on the 911 recording demanding both that the officers let go of her and that they leave her home. (Sutterfield would later say that the officers tackled her.) Sutterfield was handcuffed and placed in the officers' custody.

At that point the officers conducted a protective sweep of the home. In the kitchen, officer James Floriani observed a compact disc carrying case in plain view.[3] He picked up the soft-sided case, which was locked, and surmised from the feel and weight of its contents that there might be a firearm inside. He then forced the case open and discovered a semi-automatic

---

[3]   Sutterfield avers that the case was not actually in plain view but instead was within an opaque bag. The district court determined that she had not preserved a dispute of fact on this point in responding to the defendants' statement of material facts below. 870 F. Supp. 2d at 636 n.1. Sutterfield concedes the point for purposes of this appeal.

handgun inside; a yellow smiley-face sticker was affixed to the barrel of the gun, covering the muzzle. Also inside the case were concealed-carry firearm licenses from multiple jurisdictions other than Wisconsin. Elsewhere in the kitchen the officers discovered a BB gun made to realistically resemble a Glock 29 handgun.

The contents of the case were seized along with the BB gun and placed into police inventory for safekeeping. Berken would later state that he authorized the seizure of the handgun in order to keep them out of the hands of a juvenile, should a juvenile enter the house unaccompanied by an adult while Sutterfield remained in the hospital. (The police knew that Sutterfield had a son, whom they believed to be a juvenile, although his specific age was unknown.) Floriani would later testify that he believed it appropriate to take both the handgun and BB gun into custody so that Sutterfield, when released from the hospital, would not be able to use the handgun to commit suicide or the BB gun to provoke a police officer to shoot her.

Floriani and another officer subsequently transported Sutterfield to the Milwaukee County Mental Health Complex, a psychiatric hospital which, among other things, provides short-term in-patient and crisis management care for persons in mental distress. What occurred there is not part of the record and, in any event, is not relevant to the claims made in this litigation.

Sutterfield filed suit pursuant to 42 U.S.C. § 1983 against the city and the individual officers involved in the incident, challenging the warrantless entry into her home, the seizure of

her person, the search of the case containing the gun, and the seizure of the gun itself along with the concealed-carry licenses. She contends that these acts violated her rights under the Fourth Amendment (as made applicable to the States through the Fourteenth Amendment), and that the seizure of the revolver additionally violated her rights under the Second Amendment.

The district court granted summary judgment to the officers on these claims in a thoughtful opinion. 870 F. Supp. 2d 633. Believing that Sutterfield was not contesting the seizure of her person, *see id.* at 643, the court focused its attention on the warrantless entry into her home, the search of the locked case, and the ensuing seizure of Sutterfield's handgun. *Id.* at 637.

The court treated the entry into Sutterfield's home as presumptively invalid, as the police had no warrant. *Id.* at 637-38. It proceeded to consider whether the entry was nonetheless justified under either the community caretaking or exigent circumstances exceptions to the Fourth Amendment warrant requirement.

The court determined that the community caretaker exception, on which the defendants primarily relied, did not justify the entry. *Id.* at 640. The court reasoned that although the Wisconsin courts had deemed that exception applicable in a "broad swath of situations," *id.*, the Seventh Circuit had not done so. Indeed, in *United States v. Pichany*, 687 F.2d 204, 208-09 (7th Cir. 1982), we had expressly rejected the government's effort to apply the exception beyond the automobile context. 870 F. Supp. 2d at 640.

The court thought that the exigent circumstances exception might justify the warrantless entry into Sutterfield's home, although it ultimately abstained from a decision on that point. The court noted at the outset that this exception required the authorities to make "a fairly strong showing that the surrounding circumstances were so severe as to justify a departure from the warrant requirement." *Id.* at 638 (citing *United States v. Patino*, 830 F.2d 1413, 1415 (7th Cir. 1987)). In *Patino*, this court had cited a 30-minute wait for backup before effectuating a warrantless entry into a residence as evidence that there was no exigency, as the waiting officers could have sought a search and/or arrest warrant during that time period. *Id.* at 1415-16. In this case, more than nine hours had transpired after the police were first notified of the suicide threat before the officers entered Sutterfield's home. 870 F. Supp. 2d at 638. On the other hand, they were also executing a section 51.15 statement authorizing Sutterfield's detention for a mental health evaluation, and the court understood that statement to function as a quasi-arrest warrant. *Id.* at 639. Even if a statement of detention cannot fulfill the role of a warrant given the lack of judicial involvement, the court reasoned, the officers could have thought that the statement authorized them to take such actions as were necessary to detain Sutterfield, including entering her home. *Id.* Moreover, the officers were acting to protect life or to forestall serious injury, an interest that the court recognized can justify police action which would otherwise be illegal absent an exigency or emergency. *Id.* (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947 (2006)). The district court ultimately concluded that it was unnecessary to decide whether the warrantless entry

into Sutterfield's home was constitutionally permissible, given its subsequent conclusion that the officers were entitled to qualified immunity on the unlawful entry claim. *Id.* at 639-40.

Turning to the search of Sutterfield's home, the court reasoned that a cursory sweep of the premises, which brought the compact disc case to the officers' attention, was legally permissible notwithstanding the lack of a search warrant. The court relied on *Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093 (1990), which authorizes officers making an in-home arrest to conduct a protective sweep of the premises to determine whether other persons are present. Here, the officers were present in Sutterfield's home as the result of her doctor's 911 call. Sutterfield had not answered the officers when she was asked whether anyone else was present in the home. (The inquiry, and Sutterfield's lack of response, can be heard on the 911 recording of the encounter.) Moreover, as a result of the information provided by her physician, the officers believed that she had a gun. And the overall encounter was, in the court's word, "tense." 870 F. Supp. 2d at 640. Under these circumstances, the court deemed it appropriate for the officers to make a cursory inspection of the premises to determine if someone else might be present. *Id.* at 640-41. That permissible search led to the discovery of the compact disc case in the kitchen, which was in plain sight. *Id.* at 641.

The search of that case, and the ensuing seizure of the gun inside, was "[o]f much greater concern" to the court. *Id.* The limited search authorized by *Buie* did not extend to the contents of a locked case. Although Floriani indicated that when he picked up the case, it felt as if it might contain a gun,

the court pointed out that the case could have held "practically anything." *Id.* As the search of the case was unauthorized, the court acknowledged that both the opening of the case and the seizure of the gun found inside likely constituted violations of Sutterfield's Fourth Amendment rights. *Id.*

The court rejected Sutterfield's contention that the seizure of the gun and concealed-carry licenses also constituted a violation of her Second Amendment rights on the facts of this case. In the court's view, neither *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), nor *Dist. of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008), forecloses the possibility that an individual's firearm may be seized by the police for certain purposes. 870 F. Supp. 2d at 642. Otherwise, the court reasoned, any seizure of a gun by the authorities—if taken as evidence, for example—might constitute a Second Amendment violation. *Id.*

Although the court had found it "likely" that Sutterfield's Fourth Amendment rights had been violated, the court discerned no basis to hold Milwaukee liable for the violation. *Id.* at 642-43. Sutterfield had identified no municipal policy, custom, or practice as necessary to support a claim against the city under *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 98 S. Ct. 2018 (1978). The court theorized that Sutterfield perhaps could argue that it was an unconstitutional practice for the city to follow section 51.15 by requiring that the subject of a section 51.15 statement be taken into custody no matter the circum-

stances,[4] but Sutterfield had not made such an argument. 870 F. Supp. 2d at 643. Consequently, only the individual officers had any prospective liability. (Sutterfield has not challenged this aspect of the district court's decision.)

The court concluded that the officers, assuming they had violated Sutterfield's Fourth Amendment rights, were entitled to qualified immunity. *Id.* at 643-44. The only aspect of the encounter over which they may have lacked discretion was the decision to detain Sutterfield, which the court believed she had not contested. *Id.* at 643. The court noted that the circumstances of the encounter, if they did not qualify as exigent, were nearly so; and the boundaries separating exigent from non-exigent circumstances were not so clear as to have placed the officers on notice that their conduct exceeded the bounds of the exigent circumstances exception. *Id.* at 644. At the same time, given the breadth that the Wisconsin courts had attributed to the community caretaker exception, the officers could have thought that this exception allowed them to enter Sutterfield's home, to perform a warrantless search of the premises, including the compact disc case, and to seize the gun they found inside of that case. *Id.*

> While the Seventh Circuit has refused to read the Community Care[taker] exemption nearly as expansively as Wisconsin, and would thus seem to bind this

---

[4] Both Hewitt and Berken indicated in their depositions that they understood department policy to essentially require them to execute the 51.15 statement by taking Sutterfield into custody regardless of what transpired at her home, suggesting that the decision to seize her person was not a discretionary call on their part.

Court to find that such an exemption clearly does not apply, the Court cannot expect that police officers are schooled in the nuances of the law as it differs by jurisdiction. The police must be able to act decisively to prevent injury to citizens, especially when they are acting upon information from a third party whom it seems reasonable to believe is telling the truth, such as Dr. Bentle in this case. By entering Ms. Sutterfield's home, searching it, and seizing the items that they believed to pose a danger to both Ms. Sutterfield and members of the community who may (though it was unlikely) happen upon those items, the officers acted in that decisive, though discretionary way; and, under the laws of Wisconsin, doing so was not clearly unlawful.

*Id.* (internal quotation marks and citations omitted).

**II.**

Sutterfield challenges each aspect of the district court's summary judgment decision, save for the court's determination that the record lacked evidence sufficient to hold Milwaukee liable under *Monell* for any of the constitutional violations asserted in this case. So only the liability of the individual oficers is at issue. Sutterfield contends, in sum, that the police officers' warrantless entry into her home, the seizure of her person, the search of the locked compact disc case, and the seizure of the revolver and the concealed carry licenses discovered therein all violated her rights under the Fourth and Fourteenth Amendments, and that the seizure of the gun and licenses also violated her rights under the Second Amendment. She further contends that because these rights were clearly

established (in her view), the officers do not enjoy qualified immunity from suit. Before we turn to the merits of Sutterfield's claims, we feel compelled to say a few words about the importance of the competing interests at stake in this case.

The intrusions upon Sutterfield's privacy were profound. At the core of the privacy protected by the Fourth Amendment is the right to be let alone in one's home. *See*, *e.g.*, *Kyllo v. United States*, 533 U.S. 27, 31, 121 S. Ct. 2038, 2041-42 (2001) (citing *Silverman v. United States* , 365 U.S. 505, 511, 81 S. Ct. 679, 683 (1961)); *Payton v. N.Y.*, 445 U.S. 573, 589-90, 100 S. Ct. 1371, 1381-82 (1980). In this case, police entered Sutterfield's home forcibly and without a warrant, against her express wishes. Once inside of her home, they seized her person, again employing force because she resisted. They then searched the premises of the house, discovered the locked compact disc case, broke it open, and seized her gun and concealed carry licenses, all without a search warrant. Finally, pursuant to section 51.15, they took Sutterfield to the Milwaukee Mental Health Complex for an (involuntary) evaluation. Although the officers took each of these actions for benevolent reasons, from Sutterfield's perspective—and from the perspective of anyone in a similar situation who did not wish assistance—these were serious intrusions upon the sanctity of her home and her person.

On the other hand, courts from the United States Supreme Court on down have long recognized the important role that police play in safeguarding individuals from dangers posed to themselves and others—a role that will, in appropriate circumstances, permit searches and seizures made without the judicial sanction of a warrant. *See*, *e.g.*, *Brigham City, Utah v.*

*Stuart*, *supra*, 547 U.S. at 403-04, 126 S. Ct. at 1947 (collecting cases); *Mincey v. Ariz.*, 437 U.S. 385, 392 & nn.6-7, 98 S. Ct. 2408, 2413 & nn.6-7 (1978) (same). Here, the Milwaukee police had been contacted by Sutterfield's physician with a concern that Sutterfield might harm herself. Wisconsin law sets forth an emergency detention procedure to deal with precisely this sort of situation. Pursuant to section 51.15, a statement authorizing Sutterfield's emergency detention was prepared, and police executed that statement when they entered Sutterfield's home and took her into their custody. They looked for, discovered, and seized her firearm out of concern for Sutterfield's safety and that of any minor who might enter her home in her absence. There is no suggestion that they acted for any reason other than to protect Sutterfield from harm.

This case therefore requires us to balance Sutterfield's privacy interests, as protected by the Fourth Amendment, against a community interest—and frankly Sutterfield's own interest—in protecting her from harm, including self-inflicted harm. Aside from the importance of these competing interests, several circumstances make our job more difficult. First, the parties have given us virtually no information as to the alternatives other than emergency detention pursuant to section 51.15 that were available to the Milwaukee police in this situation. Sutterfield, for example, frequently speaks about the lack of a warrant but has not addressed what type of warrant, if any, would have been appropriate and available in the circumstances confronting the police. Her briefs seem to view the case through the lens of criminal law enforcement when the case plainly does not fit that model. Moreover, as we shall discuss, there also persists a lack of clarity in Fourth

Amendment case law as to the appropriate legal framework that should be applied to warrantless intrusions motivated by purposes other than law enforcement and evidence-gathering.

It will no doubt be frustrating to Sutterfield and to the reader that we do not reach firm conclusions as to the merits of all of the claims she has asserted and instead, like the district court, resolve the case in part based on the doctrine of qualified immunity. We recognize the significant role that resolving the merits of each claim plays in the development of precedent and clarifying the boundaries of constitutional rights. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009). But given the importance of the interests at stake, the lack of clarity in the case law, and the shallowness of the briefing as to the alternatives available to the police on the facts presented here, we believe that the tentative nature of some of our analysis is appropriate.

We now turn to the merits of Sutterfield's claims.

A. Detention of Sutterfield

Our discussion of the first claim may be brief. Although Sutterfield insists that, contrary to the district court's belief, she has challenged the defendants' seizure of her person as being contrary to the Fourth Amendment, she has not adequately developed any such argument. She does not contest that her physician reported that she had threatened to do herself harm. Further, there is no dispute that, in light of the doctor's report, there was a valid basis to pursue an emergency detention of Sutterfield under section 51.15, that the police complied with the requirements of that statute, or that the statute (and the statement completed by officers Stephens and Powers)

authorized the seizure of Sutterfield. Sutterfield suggests that the statute is unconstitutional to the extent that it permits the seizure of a person without the authorization of a judicial officer. But she fails to support her contention with any citation of authority or legal analysis.

We note that Sutterfield's position presumes that prior judicial approval is required when a person is detained not because she is suspected of a crime but rather because she is believed to pose a danger to herself. In that respect, she makes no distinction between the law enforcement and community caretaking functions of the police. Her argument, moreover, calls into question the constitutionality not only of Wisconsin's section 51.15, but a host of comparable provisions found in other state codes. Many if not most states have provisions authorizing the emergency detention of individuals based on information indicating that they pose a danger to themselves or others. *See* Treatment Advocacy Center, *Emergency Hospitalization for Evaluation—Assisted Psychiatric Treatment Standards by State* (June 2011), available at http://treatmentadvocacy center.org/storage/documents/Emergency_Hospitalization_ for_Evaluation.pdf (last visited May 9, 2014). Although the specifics of such statutes vary, they commonly do not require prior judicial approval of the emergency detention. *See*, *e.g.*, 405 Ill. Comp. Stat. 5/3-601 - 5/3-603 (authorizing involuntary admission of person to mental health facility when adult presents petition to facility indicating admission is necessary to protect self or others from harm, detailing signs or symptoms of mental illness, and describing relevant acts, threats, behavior, and so forth; petition must be accompanied by statement of qualified expert and if none immediately available, person

may be detained for purposes of examination by such expert); Indiana Code § 12-26-5-1 (authorizing detention of person for no more than 72 hours on written application of individual setting forth belief admitted person is mentally ill or dangerous and in need of immediate restraint, together with statement of at least one physician indicating person may be mentally ill or dangerous).

Our point is not to suggest that the sort of emergency detention authorized by section 51.15 and similar statutes in other states necessarily is constitutional. Our point, instead, is that given the ubiquity of such statutes, and the legitimacy of the interests in both personal and public safety underlying such statutes, a contention that an emergency detention is per se unconstitutional without prior judicial authorization demands much more than a conclusory argument to that effect. Sutterfield has waived any claim that her detention was unlawful absent the prior approval of a judge. *See, e.g.*, *Fluker v. Cnty. of Kankakee*, 741 F.3d 787, 795 (7th Cir. 2013) (perfunctory and undeveloped arguments waived). *See also In re Commitment of Louise M.*, 555 N.W.2d 807, 810 (Wis. 1996) (finding that procedures for involuntary detention set forth in section 51.15 satisfy the requirements of due process).

B.  Entry into Sutterfield's Home

The district court, as noted, found that the warrantless entry into Sutterfield's home might be justified on the basis of the exigent circumstances doctrine. Sutterfield focuses the bulk of her argument on this possibility, contending that in view of the passage of nine hours between her physician's initial phone call to the police and the point at which police sought entry

into her home, the circumstances cannot be desribed as exigent, as there was ample opportunity for the police to obtain a warrant. She adds that her own conduct in refusing to open the door to her home and admit the police cannot be said to have created an exigency where none otherwise existed.

There are three doctrines or exceptions to the warrant requirement that have been raised at one point or another in this case as possible justifications for the warrantless entry into Sutterfield's home: the community caretaking doctrine, the emergency aid doctrine, and the exigent circumstances doctrine. For the reasons that follow, we believe that the entry into Sutterfield's home was justified by the emergency aid doctrine, which the Supreme Court has deemed a subset of the exigent circumstances doctrine. But as there is some degree of overlap between the doctrines, the distinctions between them are not always clear, and all three doctrines are, to some degree, implicated in this case, we begin with a short discussion of each.[5]

---

[5] Scholars have frequently remarked on the lack of clarity in judicial articulation and application of the three doctrines. *See, e.g.*, Megan Pauline Marinos, Comment, *Breaking and Entering or Community Caretaking? A Solution to the Overbroad Expansion of the Inventory Search*, 22 GEO. MASON U. CIVIL RIGHTS L. J. 249, 261 (2012) ("Over the years, state and federal courts have muddled the distinction between the emergency aid exception to the warrant requirement and the community caretaking exception to the probable cause and warrant requirements."); Michael R. Dimino, Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 WASH. & LEE L. REV. 1485, 1494 (2009) ("The vagueness surrounding the definition of the community-caretaking category and the different standards governing the constitutionality of

(continued...)

The community caretaking doctrine recognizes that police sometimes take actions not for any criminal law enforcement purpose but rather to protect members of the public; searches (including home entries) conducted for the latter purpose are deemed exempt from the Fourth Amendment warrant requirement. The doctrine was first recognized by the United States Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523 (1973), which sustained the warrantless search of an automobile in police custody that was conducted as a matter of routine for a purpose "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *id.* at 441, 93 S. Ct. at 2528. As we shall see, state and federal courts have divided over the scope of the community caretaking doctrine recognized in *Cady*. This court, taking the narrow view, has confined the doctrine to automobile searches. *United State v. Pichany*, *supra*, 687 F.2d at 207-09. *Pichany* rules out the community caretaker doctrine as a basis which might justify the warrantless entry into

---

[5] (...continued)

different types of community-caretaking searches indicate that more precision is needed. There is not a single community-caretaking doctrine. Rather, there are several different community-caretaking doctrines, but courts have not clarified the constitutional interests affected by those different kinds of searches."); Deborah Tuerkheimer, *Exigency*, 49 ARIZ. L. REV. 801, 812 n. 60 (2007) ("the state of the case law in this area is remarkably confused"); Mary Elizabeth Naumann, Note, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 AM. J. CRIM. L. 325, 365 (1999) ("A review of both federal and state case law reveals a lack of consistency in the definition and boundaries of the community caretaker doctrine that control the judgment exercised by the officers in these situations.").

Sutterfield's home, as the district court recognized. But because the Wisconsin courts—which, like the court, possess the authority and indeed the obligation to interpret and apply the Fourth Amendment, *see Burgess v. Lowery*, 201 F.3d 942, 945-46 (7th Cir. 2000)—have accorded a much broader sweep to the community caretaker doctrine, and this would have given the defendants reason to believe that the entry was justified, a more detailed discussion of *Cady* and its progeny is called for.

In *Cady*, Wisconsin police officers searched the trunk of a rented automobile that had been disabled in a one-car accident. The obviously intoxicated driver of the car, Dombrowski, had informed the officers that he was a Chicago policeman. Believing that Chicago police officers were required to carry their service revolvers with them at all times, the Wisconsin police looked for a gun on Dombrowski's person and in the glove compartment and front seat of the car, but they did not find one. The car was towed to a local (private) garage and Dombrowski was taken into custody for drunken driving. Later that night, an officer visited the garage to search the car again for Dombrowski's revolver; the search was described as a matter of routine practice within the local police department. When the officer opened the locked trunk of the car, he discovered clothing and other items with blood on them. When Dombrowski was confronted with those items, he directed police to a body on his brother's farm. Dombrowski was ultimately charged with murder, and the items discovered in the trunk of the car were admitted at trial as evidence. Dombrowski was convicted. On habeas review, this court agreed with Dombrowski that the search of the car trunk violated his Fourth Amendment rights, as there was no

exigency that might have justified a warrantless search. *Dombrowski v. Cady*, 471 F.2d 280, 283-84 (7th Cir. 1972) (2-1 decision). The Supreme Court reversed.

The Court in *Cady* sustained the search of car trunk as a legitimate exercise of the police force's community caretaking function. After first noting that the touchstone of the Fourth Amendment is "reasonableness," *id.* at 439, 93 S. Ct. at 2527, the Court pointed out that it had long distinguished automobile searches from searches of the home, both because cars are inherently mobile, lending greater justification to warrantless searches, and because the highly-regulated status of motor vehicles brings the police into frequent contact with automobiles—and any contents, including contraband, which are in plain view—for reasons unrelated to the investigation of crime. *Id.* at 440-42, 93 S. Ct. at 2527-28. In this case, the police had been compelled to assume custody of Dombrowski's rental car because Dombrowski himself was unable to drive and because the wrecked vehicle otherwise presented a nuisance upon the roadway. *Id.* at 442-43, 93 S. Ct. at 2529. After they took custody of the car, police had followed what the lower courts had determined to be standard operating procedure in searching the car for Dombrowski's service revolver. That search was conducted not for evidence-gathering purposes but rather for safety reasons: the car had been towed to a garage lot which was not secured, leaving any gun inside accessible to vandals. *Id.* at 443, 448, 93 S. Ct. at 2529, 2531. Thus, the search, although unsupported by a warrant, constituted a legitimate exercise of the police force's community caretaking function. *Id.* at 447-48, 93 S. Ct. at 2531.

*Cady*'s holding has since evolved into a rule authorizing a routine, warrantless inventory search of an automobile lawfully impounded by the police. In *South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092 (1976), for example, the Court sustained the search of a car which had been impounded by police after it was left parked illegally in a restricted zone; the search had unearthed marijuana in the vehicle's glove compartment. After reiterating *Cady*'s rationale and adding that the individual has a lesser expectation of privacy in the automobile than in the home, *id.* at 367-69, 96 S. Ct. at 3096, the Court noted that a routine inventory search of an impounded vehicle serves multiple needs: protection of the owner's property, protection of the police against allegations of lost or stolen property, and protection of the police from potential danger, *id.* at 369, 96 S. Ct. at 3097. The search, conducted for legitimate caretaking reasons and not as a pretext for evidence-gathering, therefore met the Fourth Amendment's reasonableness standard. *Id.* at 375-76, 96 S. Ct. at 3100; *see also, e.g., United States v. Jackson*, 189 F.3d 502, 508-09 (7th Cir. 1999). *Opperman*, as it turned out, marked the last time that the Supreme Court relied to any meaningful degree on the community caretaking function of the police in evaluating the reasonableness of searching automobiles and other items impounded by the police; subsequent cases have rested on *Opperman*'s description of the search as a routine "inventory" search. *See, e.g., Colorado v. Bertine*, 479 U.S. 367, 371, 107 S. Ct. 738, 741 (1987) ("inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment"); *see also* Marinos, *supra* n.5, 22 GEO. MASON U. CIVIL RTS. L. J. at 251 n.11, 259.

This court, as we have mentioned, has limited the community caretaker doctrine to automobile searches. *Pichany*, 687 F.2d at 207-09. Our decision in *Pichany* addressed the warrantless search of a commercial warehouse. Police officers had arrived early for a meeting at an industrial park with a business owner who had reported a burglary of his warehouse. While looking for the owner, the officers wandered into the defendant's nearby warehouse, which was both unlocked and unmarked—but which was not the warehouse reported burglarized. There they discovered several stolen tractors, which resulted in the defendant being charged with theft. After the district court suppressed the evidence discovered in the warehouse, the government appealed, seeking to justify the warrantless entry into the defendant's warehouse on the basis of the community caretaker doctrine. The government argued that when the officers entered the defendant's warehouse, they were not investigating the defendant's possible involvement in a crime but simply looking for the individual who had reported a burglary. We rejected the invitation to extend *Cady*'s community caretaking rationale beyond the automobile context. "None of the factors which the Court found characterized the community caretaking function are present here." 687 F.2d at 207. We pointed out that, in contrast to the situation in *Cady*, the police had not exercised control or dominion over the defendant's warehouse, nor was there any threat of damage or theft that might have triggered a duty on the part of the officers to secure his warehouse. *Id.* at 207-08. More fundamentally, the Court in *Cady*, by stressing the circumstances that differentiated cars from houses and other things that might be searched, had indicated that its holding "extended only to

automobiles temporarily in police custody." *id.* at 208. "Conse-quently, the plain import from the language of the *Cady* decision is that the Supreme Court did not intend to create a broad exception to the Fourth Amendment warrant require-ment to apply whenever the police are acting in an 'investiga-tive,' [*i.e.*, community caretaking] rather than a 'criminal' function." *Id.* at 208-09 (quoting *Cady*, 413 U.S. at 453, 93 S. Ct. at 2534) (Brennan, J., dissenting)).

The other circuits are divided on the question of whether the community caretaker exception applies outside of the automobile context, and in particular to warrantless searches of the home. In addition to this circuit, the Third, Ninth, and Tenth circuits have confined the community caretaking exception to the automobile context. *See Ray v. Tp. of Warren*, 626 F.3d 170, 177 (3d Cir. 2010); *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994) (2-1 decision); *United States v. Erickson*, 991 F.2d 529, 531-33 (9th Cir. 1993).[6] In contrast, the Fifth, Sixth, and Eighth circuits have relied on the community caretaking exception to justify warrantless searches of the home. *See United States v. Quezada*, 448 F.3d 1005, 1007-08 (8th Cir. 2006); *United States v. Rohrig*, 98 F.3d 1506, 1521-25 (6th Cir. 1996) (2-1 decision); *United States v. York*, 895 F.2d 1026, 1029-30 (5th Cir.

---

[6]  More recently, the Ninth Circuit found that a warrantless entry into a home was justified when police entered the home in a community caretaking role while responding to a perceived emergency; the court emphasized that the circumstances must present a genuine emergency in order for such an entry to be justified. *See United States v. Stafford*, 416 F.3d 1068, 1073-75 (9th Cir. 2005). Despite the references to community caretaking, the decision is probably best characterized as relying on the emergency aid doctrine rather than the community caretaking doctrine.

1990) (framed as an exigent circumstances decision, but stressing community caretaking role of police in abating noise disturbance). However, the Sixth Circuit more recently has expressed doubt that the community caretaking doctrine would generally authorize the warrantless entry into a home, *see United States v. Williams*, 354 F.3d 497, 508 (6th Cir. 2003), although its decision in that case ultimately rested on the fact that police were motivated by a suspicion of criminal wrong-doing in addition to community caretaking purposes, *id.* Finally, the Fourth Circuit has indicated that the community caretaking exception may justify a warrantless residential search when, as in *Cady*, the search is conducted pursuant to routine procedure and not for purposes of criminal evidence-gathering. *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009) (Wilkinson, J.). *See also MacDonald v. Town of Eastham*, 2014 WL 944707, at *4-*6 (1st Cir. Mar. 12, 2014) (noting disarray in cases and leaving question open); *United States v. McGough*, 412 F.3d 1232, 1238-39 (11th Cir. 2005) (noting that "we have never explicitly held that the community caretaking functions of a police officer permit the warrantless entry into a home"; court goes on to find that in any event facts did not warrant application of the exception in that case). A similar division exists at the state level. *See* Gregory T. Helding, Comment, *Stop Hammering Fourth Amendment Rights: Reshaping the Community Caretaking Exception With the Physical Intrusion Standard*, 97 MARQUETTE L. REV. 123, 143-48 (2013) (collecting cases extending community caretaking exception beyond the automobile context); Naumann, *supra* n.5, 26 AM. J. CRIM. L. at 352-57 (surveying different approaches employed by state courts).

As the district court noted, the Wisconsin courts in particular have extended the community caretaking doctrine to searches of homes. We reserve our discussion of the Wisconsin precedents for our qualified immunity analysis below. For now, it is sufficient to express our agreement with the district court that, given our decision in *Pichany*, the warrantless entry into Sutterfield's home cannot be sustained on the basis of the community caretaker doctrine.

The exigent circumstances exception to the warrant requirement constitutes a second ground on which the warrantless entry into Sutterfield's home potentially could be justified. Pursuant to this exception, a warrantless entry into a dwelling may be lawful when there is a pressing need for the police to enter but no time for them to secure a warrant. *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949 (1978); *see also, e.g., Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013). Recognized exigencies include situations in which the occupant of a residence is injured or is in danger of imminent injury, *Michigan v. Fisher*, 558 U.S. 45, 47-48, 130 S. Ct. 546, 548-49 (2009); *Brigham City, Utah v. Stuart, supra*, 547 U.S. at 403-04, 126 S. Ct. at 1947; *see, e.g., Fitzgerald*, 707 F.3d at 731-32) (danger of suicide); when there is a danger posed to others by the occupant of a dwelling, as when the occupant is armed and might shoot at the police or other persons, *e.g., United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); when police are in "hot pursuit" of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42-43, 96 S. Ct. 2406, 2409-10 (1976) (citing *Warden v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642 (1967)), or there is a risk that the suspect may escape, *see Minnesota v. Olson*, 495 U.S. 91, 100, 110 S. Ct. 1684, 1690 (1990); and to prevent the imminent

destruction of evidence, *Kentucky v. King*, 131 S. Ct. 1849, 1856-57 (2011). Whether the exigent circumstances exception justifies warrantless action is judged by an objective standard: we ask whether it was reasonable for the police officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant. *See Tyler*, 436 U.S. at 509, 98 S. Ct. at 1949; *e.g.*, *Fitzgerald*, 707 F.3d at 730. There must be a genuine need to forego the warrant process; and in assessing that need, we must focus not only on the moment that police made the decision to make the warrantless entry, but rather "appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door." *United States v. Patino*, *supra*, 830 F.2d at 1416 (quoting *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir.1974) (footnote omitted) (Stevens, J.)).

Related to both of the foregoing exceptions to the warrant requirement is the emergency or emergency aid doctrine, which recognizes that a warrantless entry into the home may be appropriate when police enter for an urgent purpose other than to arrest a suspect or to look for evidence of a crime. *See Mincey v. Ariz.*, *supra*, 437 U.S. at 392-93, 98 S. Ct. at 2413; *Hanson v. Dane Cnty., Wis.*, 608 F.3d 335, 337-38 (7th Cir. 2010); *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000); *United States v. Salava*, 978 F.2d 320, 324-25 (7th Cir. 1992). Like the community caretaker exception to the warrant requirement, this doctrine recognizes that police play a service and protective role in addition to a law enforcement role. *See Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994) (citing *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)). In the

former capacities, police officers may sometimes need to enter a dwelling in order to render aid to an occupant whom they believe to be in distress and in immediate need of their assistance. *Id.* The test for this exception is also objective: the question is whether the police, given the facts confronting them, reasonably believed that it was necessary to enter a home in order to "render assistance or prevent harm to persons or property within." *Id.* (quoting *Moss*, 963 F.2d at 678); *see also United States v. Jenkins*, 329 F.3d 579, 581-82 (7th Cir. 2003).

Although we had understood the emergency aid doctrine to be separate from (albeit related to) the exigent circumstances exception, *see Sheik-Abdi*, 37 F.3d at 1244, *see also Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009); John F. Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions*, 89 J. CRIM. L. & CRIMINOLOGY 433, 441-45 (1999), the Supreme Court in *Brigham City* effectively made the former a subset of the latter. 547 U.S. at 403-4, 126 S. Ct. at 1947; *see* Tuerkheimer, *supra* n.5, 49 ARIZ. L. REV. at 812-13 & n.60.

The police in *Brigham City* had responded to a 3:00 a.m. call complaining of a loud party at a residence. On arrival at the residence, the officers heard shouting from inside of the house, walked down the driveway, saw two juveniles drinking beer in the backyard, and from there noticed an altercation taking place in the kitchen of the home. Through a screen door, they saw four adults attempting to restrain a juvenile, who was able to break free and strike one of the adults, drawing blood. As the struggle continued, one of the officers opened the door to

the kitchen, announced himself, and then entered. At that point, the altercation ceased. The police ultimately arrested the adults for, *inter alia*, contributing to the delinquency of a minor and disorderly conduct. At issue before the Supreme Court was the lawfulness of the police officers' entry into the residence.

The Court determined that the interest in preventing injury to an occupant of the home justified a warrantless entry by the police. The Court recognized that the need to assist a person who is seriously injured or who is threatened with such an injury is one type of exigency that obviates the need to obtain a warrant: "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." 547 U.S. at 403, 126 S. Ct. at 1947 (internal quotation marks and citations omitted). "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Ibid.* The officers' subjective motive for the entry—be it to quell violence or to make an arrest, for example—is irrelevant; what matters is whether the facts, viewed objectively, justified the action taken by the police. *Id.* at 404-05, 126 S. Ct. at 1948. In this case, the officers witnessed a fracas ongoing within the home that had already resulted in injury to one of the occupants. The officers consequently had reason to believe both that the person who had been struck might need help and that the fight might continue without intervention. The entry into the home was therefore reasonable. *Id.* at 406, 126 S. Ct. at 1949.

We relied on *Brigham City*'s exigency rationale in *Fitzgerald*, 707 F.3d 725, to sustain a warrantless entry into a home where

police had reason to believe that the occupant might harm herself. The police in *Fitzgerald* were summoned to the plaintiff's home after she had a telephone conversation with a police officer that caused that officer to be concerned that she might be suicidal. At the conclusion of a stressful, aggravating day, the plaintiff, who had been drinking, attempted to contact a local help line but instead found herself speaking to the desk sergeant at a local police station. Although she denied entertaining suicidal thoughts, the sergeant, while remaining on the line with her, dispatched officers to her home, reporting that she was highly depressed, intoxicated, and possibly suicidal. As the officers were approaching the plaintiff's condominium, they learned that the plaintiff had just abruptly hung up on the desk sergeant. At that point, the officers made a forced, warrantless entry into the plaintiff's home. After speaking with her for a period of 30 minutes, the officers ultimately took the plaintiff into custody against her will for evaluation at a hospital. She later filed suit, contending among other things that the warrantless intrusion into her home violated the Fourth Amendment.

We concluded that the entry was justified based on the exigent circumstances exception. Given the information available to the officers, it was objectively reasonable for them to believe at the time they entered the home that the occupant was in need of immediate assistance. *See id.* at 731(quoting *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993)). The fact that the officers who arrived on the plaintiff's doorstep had not personally observed any suicidal behavior was not dispositive. They were reasonably relying on information provided to them by the desk sergeant, who had conveyed to them that the

plaintiff had called the police station, that she sounded both intoxicated and suicidal, and had abruptly hung up as officers approached her home.

> This case fits snugly within our precedents holding that police officers and other emergency personnel must be "able to assist persons in danger or otherwise in need of assistance." *Richardson*, 208 F.3d at 630. "[W]hen police are acting in a swiftly developing situation … a court must not indulge in unrealistic second-guessing." *Leaf v. Shelnutt*, 400 F.3d 1070, 1092 (7th Cir. 2005) (internal quotation marks omitted). We apply that maxim again today.

707 F.3d at 732.

*Fitzgerald*, we believe, guides us to a particular result in this case; but before we turn back to the particular facts before us, several points deserve making as to the three doctrines we have just discussed. All three doctrines, to the extent they authorize the police to make a warrantless entry into a dwelling in order to render aid to a member of the public—sometimes described as an "assistance search," *see* Dimino, *supra* n.5, 66 WASH. & LEE L. REV. at 1488—are speaking to the community caretaking function of police officers, *see id.* at 1494. There are, nonetheless, important differences in both the doctrines and how courts apply them that present challenges in deciding which of them governs a particular set of facts.

Exigency, for example, is defined by a time-urgent need to act that makes resort to the warrant process impractical. *See id.* at 1508; *see also*, *e.g.*, *Tyler*, 439 U.S. at 509, 98 S. Ct. at 1949;

*United States v. Foxworth*, 8 F.3d 540, 544-45 (7th Cir. 1993). If, on the other hand, there is time for the police to seek a warrant, then one must be sought: see, for example, our decision in *Patino*, 830 F.2d at 1416-17, which the district court discussed. 870 F. Supp. 2d at 638; *see also, e.g., United States v. Talkington*, 843 F.2d 1041, 1046 (7th Cir. 1988) (remanding for determination of whether agents had time to procure warrant). But the focus on the standard warrant process presumes that there is reason to believe that something criminal is afoot. Exigency cases thus typically speak either of there being probable cause to believe a crime is being or has been committed or of the need to act in order to fulfill the probable cause requirement, as by preventing a suspect from fleeing or preserving evidence that might otherwise be destroyed. *See* Marinos, 22 GEO. MASON U. CIVIL RTS. L. J. at 262; Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment*, 1998 U. CHI. LEGAL FORUM 261, 274-77 (1998); *Brigham City*, 547 U.S. at 402, 126 S. Ct. at 1946 (discussing and quoting from decision of court below, *Brigham City v. Stuart*, 122 P.3d 506, 5014 (Utah 2005)); *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1221 (9th Cir. 2014); *Hogan v. Cunningham*, 722 F.3d 725, 731-32 (5th Cir. 2013); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013); *Storey v. Taylor*, 696 F.3d 987, 992 (10th Cir. 2012); *United States v. Watson*, 489 F. App'x 922, 925 (6th Cir. 2012) (unpublished); *Cisneros v. Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010); *United States v. Coles*, 437 F.3d 361, 365-66 (3d Cir. 2006); *United States v. Cephas*, 254 F.3d 488, 494-95 (4th Cir. 2001); *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995); *United States v. Dawkins*, 17 F.3d 399, 403 (D.C. Cir. 1994). In this respect, the exigent circumstances doctrine, as it has

traditionally been understood, is ill-suited to assistance searches like the one in this case, where there was no reason to suspect anyone of committing a crime. *See* Dimino, 66 WASH. & LEE L. REV. at 1512 ("All community-caretaking cases are incompatible with Fourth Amendment requirements of warrants and probable cause."); *see also id.* at 1494, 1508-09, 1512-13; Livingston, 1998 U. CHI. LEGAL FORUM at 277 ("For community caretaking intrusions, … the exigency concept is considerably less straightforward."); *Sheik-Abdi*, 37 F.3d at 1244 (citing *Moss*, 963 F.2d at 678) (noting that whether warrantless entry effectuated for law enforcement purpose or service/protective purpose may distinguish exigent circum-stances doctrine from emergency aid doctrine).

The emergency aid doctrine logically is a better fit in this regard, its defining characteristic being urgency, *see* Dimino, 66 WASH. & LEE L. REV. at 1505-06, and there being no logical need to additionally consider probable cause and the availability of a standard criminal warrant. *See* Decker, 89 J. CRIM. L. & CRIMINALITY at 439, 455; Livingston, 1998 U. CHI. LEGAL FORUM at 277. And that appears to be true notwithstanding the Supreme Court's decision in *Brigham City* to place the emer-gency aid doctrine within the exigent circumstances frame-work. *See United States v. Gordon*, 741 F.3d 64, 70 (10th Cir. 2014) ("Officers do not need probable cause if they face exigent circumstances in an emergency.") (internal quotation marks and citation omitted); *United States v. Timmann*, 741 F.3d 1170, 1178 & n.4 (11th Cir. 2013); *Hunsberger v. Wood*, *supra*, 570 F.3d at 555; *United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006); *United States v. Stafford*, *supra* n.6, 416 F.3d at 1075. But, as we discuss below, the real difficulty with applying the

emergency aid doctrine to a case like this one may be the passage of a substantial amount of time between the point at which the police are on notice that someone requires their aid and the point at which they make a warrantless entry into that person's home. The doctrine may not require that action be taken immediately in order for it to be characterized as "emergency" aid, *see* Dimino, 66 WASH. & LEE L. REV. at 1507 (delays may be tolerable if they are explained) (citing Decker, 89 J. CRIM. L. & CRIMINOLOGY at 508), but at some point, the passage of time will undermine the notion that emergency aid was required, *id.* at 1506-07.

The community caretaking doctrine has a more expansive temporal reach, in that its primary focus is on the purpose of police action rather than on its urgency. *See* Livingston, 1998 U. CHI. LEGAL FORUM at 277 ("the relevance of time as a limiting principle in the exigency equation seems less apparent in these community caretaking intrusions—since police could not have obtained a traditional warrant in any event"); *see also* Marinos, 22 GEO. MASON U. CIVIL RTS. L. J. at 280; Dimino, 66 WASH. & LEE L. REV. at 1506. Moreover, as we have already mentioned and as we shall discuss further, because this doctrine presumes that the police are not acting for any law enforcement purpose, whether or not there is time to seek a traditional criminal warrant is immaterial (although, as we also discuss, a different type of warrant could be envisioned).

As a matter of doctrine, then, the community caretaking doctrine would potentially be the best fit for this case, in that it captures the beneficent purpose for which police entered Sutterfield's home and leaves more room for the delay that preceded it than the emergency aid doctrine otherwise might.

And because there is no suggestion that police had any law enforcement motive in entering the home, there would be a ready basis on which to distinguish criminal cases like *Patino*, which demand a search warrant when there is, in fact, time in which to seek one.

Yet, our decision in *Pichany* obviously forecloses reliance on the community caretaking doctrine here. Although the defendants invoked the community caretaking doctrine below, they have not pursued it on appeal, let alone asked us to reconsider *Pichany*. And the division among the federal circuits as to the appropriate scope of the community caretaking doctrine makes clear that there is no obvious answer as to whether it is appropriate to extend that doctrine beyond the automobile setting that the Supreme Court dealt with in *Cady*. The defendants have chosen instead to rely on the exigent circumstances exception to the warrant requirement and, in particular, the emergency aid exception that *Brigham City* places within the exigency framework, as the justification for their entry into their home. And ultimately, given the Court's decision in *Brigham City* and our own decision in *Fitzgerald*, we believe they are right on that score.

As in *Fitzgerald*, the officers in this case had objectively reasonable grounds on which to believe that Sutterfield might harm herself. The police had been advised by Sutterfield's physician that she had threatened to take her own life. Based on that report, they had completed a statement of emergency detention that authorized officers to take Suttefield into custody for a mental health evaluation. When officers arrived at Sutterfield's home that evening and tried to talk to her, she

would not allow them into her home. Sutterfield contends that she was not acting "erratically," as the district court put it, but simply wished to be left alone. Perhaps so. But the relevant point, for our purposes, is that nothing transpired at the front door of her home that might have put the police on notice that the emergency that had been reported by Sutterfield's physician, and which was the basis for the section 51.15 statement of emergency detention, had dissipated. It was objectively reasonable for police on the scene to believe that the danger to Sutterfield's well-being was ongoing and that, in the absence of Sutterfield's cooperation, they needed to enter the home forcibly, as they did.

To say, as Sutterfield does, that given the passage of time and her own assurances to the officers that she was fine, that there was no longer any emergency, and that the officers should have heeded her demands that they leave, is to engage in the very sort of second-guessing that we eschewed in *Fitzgerald*. How were the officers to know that Sutterfield was competent to assess the state of her own mental health or that, regardless of what she herself said, there was no longer any risk that she might harm herself? Only a medical professional could make that judgment, and the officers had prepared and were executing a section 51.15 statement for the very purpose of having her evaluated by such a professional.

There are, as we have acknowledged, outstanding questions about the extent to which the exigent circumstances exception to the warrant requirement, and the emergency aid subset of exigency precedent, apply to a situation like this one. The district court itself had doubts about whether the warrantless entry into Sutterfield's home could be justified on the basis

of exigency; and the overlapping and uncertain boundaries of the three doctrines we have been discussing certainly leave room for Sutterfield's contention that neither the exigent circumstances doctrine nor any other justifies the entry into her home given the facts presented.

Clearly, one concern is the nine hours that passed between the initial report from Sutterfield's physician and the entry into Sutterfield's home. Again, the exigency doctrine generally, and the emergency aid doctrine in particular, presume that there is an emergency that requires expeditious, if not immediate, action on the part of the police. *See Fitzgerald*, 707 F.3d at 731 (quoting *Arch*, 7 F.3d at 1304); *cf. Hunsberger v. Wood*, 570 F.3d at 554 (whereas "[t]he community caretaking doctrine requires a court to look at the *function* performed by a police officer, … the emergency exception requires an analysis of the *circumstances* to determine whether an emergency requiring immediate action existed") (emphasis in original). Sutterfield suggests that, by the time police chose to force open her storm door, the facts known to the officers dispelled any notion that there was an urgent need for them to enter her home: she had told her physician to call off the police, many hours had passed since the doctor's initial communication with the police, and when the police arrived on her doorstep they could see that she was alive, coherent, and did not want their assistance. We should note that on the current record, we see no indication that the police acted in anything but a conscientious and expeditious manner; they simply had trouble locating Sutterfield. Still, it is a reasonable and important question how long the police may claim that a putative emergency justifies warrantless action. Section 51.15 itself specifies no limit on the time that police

have to execute a statement of emergency detention. At oral argument, the defendants' attorney suggested that 24 hours might in practice be the outer limit in a case such as this one. But although we agree with Sutterfield that emergencies do not last forever, it would be folly for us to try to declare *ex ante* some arbitrary cut-off that would apply to all emergency aid cases. Even in this case, it is not at all clear to us, nor would it have been to the police, that the mere passage of time without apparent incident was sufficient to alleviate any concern that Sutterfield might yet harm herself. *Cf. United States v. Salava*, *supra*, 978 F.2d at 324-25 (period of 90 minutes that police took to identify lessee of mobile home and to take various precautionary measures before entering home to check for presence of murder victim did not vitiate emergency). And the parties have given us no information about how long a threat of suicide could be thought to impose an imminent danger of harm to the person who made it; certainly nothing in this record suggests that such a threat necessarily diminishes with the passage of a few hours or with the suicidal individual's assurances that she is fine.

A related concern involves the opportunity to seek a warrant. As we have said, the exigent circumstances exception traditionally has been understood to excuse the lack of a warrant when, although a warrant is available, the need for immediate action deprives law enforcement of adequate time to seek one. *E.g.*, *Michigan v. Tyler*, *supra*, 436 U.S. at 509, 98 S. Ct. at 1949-50; *United States v. Schmidt*, 700 F.3d 934, 937 (7th Cir. 2012); Livingston, 1998 U. CHI. LEGAL FORUM at 274-77. Proceeding from the premise that a warrant theoretically was available to the police officers involved in this case, Sutterfield

has argued that there was ample time for them to seek a warrant. The district court, having our decision in *Patino* in mind, saw some merit in that argument. Pointing out that even if one confines the analysis to the roughly 30-minute period between the initial arrival of police at Sutterfield's doorstep and the entry into her home, the district court noted that *Patino* had deemed that amount of time sufficient for the police to try and obtain a warrant. 870 F. Supp. 2d at 638 (citing *Patino*, 830 F.2d at 1415-16). Moreover, as Sutterfield suggests, it might not be appropriate for us to confine our consideration to that 30-minute period. After all, it took nine hours to track Sutterfield down after her physician first raised the alarm. There was more than sufficient time during that longer period to consult a judge. And even if we view the completion of the section 51.15 statement as the event that started the clock running, there still were between four and five hours in which to seek a warrant. Assuming that there was some type of warrant available to the police in this situation, there was, as the district court pointed out, ample time in which to seek one.

But a more fundamental question raised by this case is the relevance of the warrant requirement. Certainly it is logical to consider the availability of a warrant when the police have reason to suspect that criminal activity may be afoot, but what about cases in which the police are not acting in a law enforcement capacity? Some emergency aid cases repeat the customary language about the lack of time to seek a warrant, *e.g.*, *Fitzgerald*, 707 F.3d at 730, but one wonders whether, in the emergency aid context, it is more accurate to say that a warrant is unavailable, period. *See* Livingston, 1998 U. CHI. LEGAL FORUM at 277, 281. The typical warrant, after all, requires

probable cause to believe that someone is engaged in criminal mischief and/or that evidence of a crime will be found in a particular place, *see Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968); *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S. Ct. 407, 413 (1963); *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 1310-11 (1949), and given that the point of the exigent circumstances doctrine is to excuse the lack of a warrant, it comes as no surprise that our exigency cases (and those of other courts, *see supra* at 36) frequently reference probable cause, *e.g.*, *United States v. Venters*, 539 F.3d 801, 806-07 (7th Cir. 2008); *Leaf v. Shelnutt*, 400 F.3d 1070, 1081-82 & n.10 (7th Cir. 2005); *United States v. Rivera*, 248 F.3d 677, 680-81 (7th Cir. 2001); *Cannaday v. Sandoval*, 458 F. App'x 563, 567 (7th Cir. 2012) (per curiam) (nonprecedential decision). But in emergency aid cases, where the police are acting to protect someone from imminent harm, there frequently is no suspicion of wrongdoing at the moment that the police take action. Even in a case like *Brigham City*, for example, where there actually were signs of criminal activity (juveniles drinking beer in the backyard, and people fighting inside of the house), and the occupants of the house ultimately were arrested and charged with criminal offenses, the relevant point vis-à-vis the warrant-less entry was that immediate action was required in order to protect someone from harm. *Brigham City* thus articulated the justification for the entry not in terms of reason to believe that any crime was taking place, or that evidence was about to be destroyed, but rather as reason to believe that an occupant of the home needed their assistance. 547 U.S. at 403, 406, 126 S. Ct. at 1947, 1949. It may be, then, that probable cause in the emergency aid context is not reason to believe a crime is

occurring or has been committed, but reason to believe that someone is in need of aid and there is a compelling need to act. *See Hanson v. Dane Cnty., Wis., supra*, 608 F.3d at 338 ("probable cause just means a good reason to act"); *United States v. Jenkins*, 329 F.3d 579, 581-82 (7th Cir. 2003) (reason to believe that occupant of home, who did not respond to 911 call-back, was ill, injured, or under threat of violence); *see also United States v. Timmann*, *supra*, 741 F.3d at 1178 n.4; *United States v. Wolfe*, 452 F. App'x 180, 183 (3d Cir. 2011) (nonprecedential decision); *United States v. Martins*, 413 F.3d 139, 147 (1st Cir. 2005); Livingston, 1998 U. CHI. LEGAL FORUM at 275. This framing of the inquiry suggests that whether there was time to seek a warrant loses its relevance in the emergency aid subset of exigency cases. The passage of time may remain relevant as a measure of whether there was a true emergency justifying the intrusion into someone's home, but not in terms of whether a warrant could have been sought.

Reinforcing that point in this case is the unanswered question as to what type of warrant would have been available to the police, given that Sutterfield was not suspected of any crime.[7] We posed that question at oral argument and neither

---

[7] We set aside the possibility, not discussed by the parties, that attempted suicide might constitute a crime and that the police would have had reason to take warrantless action in order to prevent Sutterfield from committing that crime. Consistent with most states, Wisconsin prohibits assisting another person to take her own life, *see* Wis. Stat. § 940.12, but does not appear to make attempted suicide itself a crime. *See generally* 2 Wayne R. LaFave, SUBSTANTIVE CRIM. L. § 15.6 (aiding and attempting suicide) (2d ed. updated through October 2013) ("In some states attempted suicide, which

(continued...)

counsel could identify such an alternative. Sutterfield's counsel suggested that perhaps the police could have sought a writ of capias[8] or bench warrant authorizing Sutterfield's detention, but the legal basis for such a course of action in Wisconsin remains unclear. Sutterfield's counsel may be correct in arguing that the lack of an available warrant procedure does not foreclose her Fourth Amendment challenge to the warrantless entry; the judiciary could, in theory, require the creation of an appropriate procedure. That is essentially what the Supreme Court did in *Camara v. Muni. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 87 S. Ct. 1727 (1967). In *Camara*, the Court dealt with an inspection scheme pursuant to which city housing inspectors had the right to enter any building at a reasonable time simply upon presentation of their credentials. The plaintiff had been charged with a misdemeanor offense after he had repeatedly refused to allow an inspection of his apartment pursuant to this scheme. He contended that such a warrantless inspection violated his rights under the Fourth and Fourteenth Amendments. The Supreme Court agreed. In the absence of the resident's consent, the Court held, authorities

---

[7] (...continued)
was a common law misdemeanor, was at one time a crime, but the prevailing view has long been otherwise.") (footnotes omitted); *see also State v. Genova*, 252 N.W.2d 380, 383 (Wis. 1977) ("Common law crimes were abolished in Wisconsin in the 1955 Criminal Code.") (citing Wis. Stat. § 939.10).

[8] A writ of capias is essentially a writ commanding an officer to take a named individual into custody, typically when he has failed to appear or failed to comply with a judgment. *See* BLACK'S LAW DICTIONARY 236 (9th ed. 2009).

were required to obtain an administrative warrant for an inspection supported by probable cause to believe that the building for which the warrant is sought qualifies for inspection pursuant to reasonable legislative or administrative standards (based on such factors as the type of building, the condition of the surrounding area, and the passage of time) for conducting an inspection. *Id.* at 538, 87 S. Ct. at 1735-36. *Camara* at least takes us out of the crime-detecting context, but obviously it is not a close fit with this case, which does not involve anything like a uniform inspection scheme.

What Sutterfield would envision, presumably, is something more like a standard criminal warrant-application process in the sense that it is individualized, but pursuant to which a neutral decisionmaker determines whether there is reason to believe that the occupant of a dwelling is in danger such that entry into (and search of) the dwelling is necessary to address that danger. At least one writer has argued in favor of a community-caretaking warrant as a means of guarding against unnecessary intrusions into the sanctity of the home and against police abuses. Marinos, Comment, 22 GEO. MASON U. CIVIL RTS. L. J. at 284-89; *see also* Dimino, 66 WASH. & LEE L. REV. at 1520-21. But the parties have cited no existing process by which such a warrant could be obtained, whether in Wisconsin or any other jurisdiction. And we have found no Wisconsin case citing section 51.15 which identifies an alternative procedure that was available to the police in the situation confronting them.

To be clear then, what Sutterfield is arguing for is the creation of a particular type of warrant that does not currently exist. In making that argument, however, she does not discuss

who would issue a community caretaking warrant, what the criteria for issuance of such a warrant would be, what type of evidence would be required to meet those criteria (in a case like this one, for example, would the statement of a physician or other qualified mental health professional be necessary?), or how such a warrant might interact with an emergency commitment scheme like that established by section 51.15. Much like Sutterfield's cursory contention that section 51.15 is unconstitutional, her suggestion that a warrant is required in a situation like this one amounts to no more than a premise that is stated without any elaboration or substance. We would also point out that the advisability of, and precedential support for, a warrant requirement for assistance searches are open to debate. *Compare* Marinos, 22 GEO. MASON U. CIVIL RTS. L. J. at 285, 288 ("By requiring a community caretaking warrant, a neutral third party would determine [in advance] whether the circumstances rise to the level that requires entry into a home by balancing the need to search against the resident's Fourth Amendment rights. … Relying solely on an ex post reasonableness determination has contributed to a muddling of the exigent circumstances exception and [the community caretaking doctrine] in various courts that have extended the [community caretaking doctrine] to the home."), *with* Dimino, 66 WASH. & LEE L. REV. at 1521 ("Requiring administrative warrants for nonemergency community-caretaking searches as a matter of Fourth Amendment doctrine carries substantial disadvantages … . [It] would be a substantial shift from the Supreme Court's practice in the community-caretaking area, which has shown no inclination whatever to require any kind of warrant, and it would be contrary to the trend of the Court's other Fourth Amendment

cases, which have tended of late to stress the Reasonableness Clause much more than the Warrant Clause. … Additionally, community-caretaking situations arise on the spur of the moment, and it is difficult to imagine officers being able to expend the time necessary to obtain a warrant while their crime-detection and crime-prevention duties go neglected."). A decision akin to *Camara* requiring such a warrant, whatever its merits might be, would require a much more developed argument than this.

Returning to first principles: What the Fourth Amendment requires in all cases is reasonableness, *Kentucky v. King*, *supra*, 131 S. Ct. at 1856; *Brigham City*, 547 U.S. at 403, 126 S. Ct. at 1947, and without knowing what, if any, alternative process was available to the police, we are not prepared to say that the warrantless entry into Sutterfield's home was unlawful under the circumstances presented to them. The police acted out of legitimate concern for Sutterfield's safety and well-being (in other words, there is no hint that they were using the emergency as a pretext to look for evidence of a crime), they acted consistently with section 51.15, and the circumstances generally meet the criteria for a warrantless entry articulated in *Brigham City* and applied in *Fitzgerald*, in that it was objectively reasonable for the officers to believe that their intervention was required in order to prevent Sutterfield from harming herself, notwithstanding her own protestations to the contrary. Her own physician, a psychiatrist, had expressed concern for Sutterfield's well-being and declared a need for intervention on her behalf, and despite the passage of time between the physician's initial telephone call to the police and the forced entry into Sutterfield's home, the record contains no evidence,

other than Sutterfield's own protestations at the time, that the crisis had passed and that she no longer presented a threat to herself. We are not in any position, in fact, to second-guess the police, who were following the procedure prescribed by Wisconsin law (the constitutionality of which has not been preserved as an issue in this appeal). The forced entry into Sutterfield's home was reasonable under the circumstances.

C.  Protective Sweep of Sutterfield's Home

Sutterfield has conceded that if the police officers' entry into her home was legal, a protective sweep of the premises of the type authorized by *Buie* was also appropriate. Sutterfield Br. 17. Given our conclusion that the forced entry was reasonable, the sweep that resulted in the discovery of the locked compact disc case containing Sutterfield's gun and various concealed-carry licenses was also reasonable, and we need not discuss the sweep further.

D.  Search of the Locked Case

Opening the locked compact disc case was a significant step beyond the search authorized by *Buie*. The case was obviously too small to be hiding a person, the case itself was innocuous, and although Floriani averred that he thought the weight and feel of the case was consistent with a gun being inside, that was at most a very good guess—as the district court pointed out, the case could have contained almost anything.[9]

---

[9]  Even if the gun had been in plain view, there would be a separate question whether the Fourth Amendment permitted the seizure of the gun, which Sutterfield lawfully possessed. But we address the legitimacy of the

(continued...)

The defendants' brief is conspicuously devoid of citation to any authority that justified the search of the locked case.[10] Even

_____

[9] (...continued)

seizure separately below. At this juncture, we are concerned solely with the decision to search the compact disc case, which was both closed and locked.

[10] The defendants cite *State v. Gocken*, 857 P.2d 1074 (Wash. Ct. App. 1993), as authority supporting a community-caretaking search of the compact disc case. Defendants' Br. 23. As *Gocken* does not address the search of a closed bag or container, the defendants probably mean to cite *State v. Gray*, No. 38406–6-1, 1997 WL 537861, at *3 (Wash. Ct. App. Sep. 2, 1997) (unpublished, nonprecedential decision), a case in which the court sustained the search of the defendant's tote bag (where both drugs and money were discovered) as a legitimate exercise of the community caretaking function. The police encounter with Gray had begun as a safety and welfare check triggered by her erratic behavior. She held the officers at bay for 30 minutes, holding a knife to her throat and threatening to kill herself; she also made a number of delusional statements. When informed that she was being taken to the hospital, Gray asked if she could take her tote bag with her. At that point an officer informed her that he would have to search the bag first. The court concluded that the search was justified on safety grounds, to ensure that there was no weapon or other item in the bag that Gray might use to harm herself. *Gray* is quite similar in that respect to *State v. Tilley*, No. 00-2540-CR, 2001 WL 942608, at *3-*4 (Wis. Ct. App. Aug. 21, 2001) (unpublished, nonprecedential decision), which upheld a search of the defendant's purse and bag (in which marijuana and drug paraphernalia were found). A police officer had taken an intoxicated and despondent Tilley to the hospital, where she began to say that she was thinking about killing herself and had attempted to do so in the past. Those remarks led the officer to take Tilley into protective custody pursuant to section 51.15 for an emergency mental health evaluation and to search her bags for anything she might use to harm herself or others. The court held that the community caretaker exception justified the search. Both cases are distinct from this case in the sense that they involved an acute need to ensure that the

(continued...)

the Wisconsin cases that extend the community caretaking doctrine to dwellings do not go so far as to endorse full searches of those dwellings and their contents. As our discussion below will reveal, those cases authorize safety-related sweeps akin to that here, and the seizure of contraband that is in plain view, but no more. It may be possible to construct an argument that when police lawfully enter a home to address the possibility that the occupant may harm herself—and particularly where, as here, they have reason to believe the person in question owns a firearm (as the gun holster Sutterfield's physician noticed suggested she did)—the police have the authority to search the premises, including closed containers, for firearms. *Cf. Cady v. Dombrowski, supra*, 413 U.S. 433, 93 S. Ct. 2523 (sustaining warrantless inventory search of locked automobile trunk for defendant's service revolver for safety reasons); *Stricker v. Tp. of Cambridge*, 710 F.3d 350, 362 (6th Cir. 2013) (in case of reported drug overdose, sustaining warrantless search of house, including closed drawers and cabinets, for clues as to what drug(s) occupant may have ingested); *Mora v. City of Gaithersburg, Md.*, 519 F.3d 216, 225-26 (4th Cir. 2008) (Wilkinson, J.) (in case of reported comments by plaintiff to hotline operator that he was suicidal, that he could understand shooting people at work, that he had weapons in his apart-

---

[10] (...continued)

detained individual did not have access to a weapon or other implement of harm in her belongings. By contrast, Sutterfield never asked to take the compact disc case with her to the hospital, so there was no immediate need to search the case in order to protect both her and the individuals who would be transporting and then examining her during the period of her emergency detention.

ment, and that he "might as well die at work," sustaining
warrantless search of plaintiff's luggage, van, and apart-
ment—including locked rooms, gun safes, and filing cabi-
nets—even after plaintiff had been seized and handcuffed, in
order to determine scope of threat potentially posed by
plaintiff). It bears noting, however, that this would be an
argument for license to conduct virtually a top-to-bottom
search of the home, as almost any closet, drawer, or container
theoretically could contain a handgun (or other potential
implements of self-harm). In any case, the defendants have not
developed such an argument here.

We therefore proceed on the assumption that the search of
the locked compact disc case was unlawful. Sutterfield had a
privacy interest in the contents of the case regardless of
whether the police were searching the case for a law enforce-
ment purpose or solely for purposes of protecting Sutterfield
from harm. *See Camara*, 387 U.S. at 530, 87 S. Ct. at 1732 ("It is
surely anomalous to say that the individual and his private
property are fully protected by the Fourth Amendment only
when the individual is suspected of criminal behavior."); *Dubbs
v. Head Start, Inc.*, 336 F.3d 1194, 1206 (10th Cir. 2003)
(McConnell, J.) ("The focus of the Amendment is … on the
security of the person, not the identity of the searcher or the
purpose of the search."); *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir.
2003) (Fourth Amendment applies to intrusions during civil as
well as criminal investigations). Even if the police had a
legitimate interest in securing any weapons that were in plain
view or that were in a place obviously meant for gun storage,
such as a gun safe (a point we address below), nothing more
than a hunch supported the notion that a gun might be inside

the compact disc case. Moreover, Sutterfield was already in police custody at the time the case was opened and was about to be transported from her home for evaluation by a mental health profession. At that point in time, she posed no immediate danger to herself. Still, for the reasons we discuss below in the qualified immunity portion of our analysis, even if the search of the case was unlawful, we believe that the police officers had ample reason to believe that it was permissible as a legitimate safety measure under the circumstances confronting them.

E.  Seizure of the Gun and Concealed-Carry Licenses

　　1.  Fourth Amendment

Our assumption that the search of the locked case containing the gun violated the Fourth Amendment requires a similar assumption as to the seizure of the gun. *Cf. Wong Sun v. United States*, *supra*, 371 U.S. at 484-86, 83 S. Ct. at 416 (evidence seized as a result of an unlawful search is fruit of the poisonous tree); *United States v. Jeffers*, 342 U.S. 48, 52, 72 S. Ct. 93, 95 (1951) ("The search and seizure are … incapable of being untied."), *overruled on other grounds by Rakas v. Illinois*, 439 U.S. 128, 98 S. Ct. 421 (1978). Nonetheless, because the reasons for the seizure have a bearing on our qualified immunity analysis, it is worth spending a few moments discussing the competing interests implicated by the seizure.

Officer Floriani's instinct to seize the gun in order to remove from the house a weapon that Sutterfield might use to harm herself was natural and understandable. (Sutterfield's empty gun holster and her remark to her doctor, after all, suggested that if she did do herself harm, she would do so with

a gun.) Nonetheless, Sutterfield had a legal right to possess the gun. And, again, once she was in police custody, there was no possibility that she was going to harm herself with the gun either at that moment or during her ensuing commitment for a mental health evaluation. Moreover, Floriani's concern as to what might happen if doctors decided to release Sutterfield after evaluating her poses a conundrum: Certainly there was a possibility that Sutterfield might again (or still) harbor suicidal thoughts; yet, she presumably would be released only if medical experts decided that she did not pose an immediate danger to herself. So although removing the gun from the house seems like a logical step to take to protect Sutterfield from self-harm, the possibility of her release tends to negate the notion that she needed such protection. Moreover, if the prospect of Sutterfield's commitment for a mental health evaluation justified the seizure of a gun, would it also have justified the removal of other items that Sutterfield might use to harm herself, such as knives and potentially lethal medications? These are not easy questions to answer.

The Fourth Circuit, when confronted with somewhat similar circumstances, cautioned against "slic[ing] the situation too finely and employ[ing] hindsight too readily to actions aimed … at heading off a human tragedy that, once visited, could not be redeemed or taken back." *Mora v. City of Gaithersburg, Md.*, *supra*, 519 F.3d at 228. Recall that the plaintiff in *Mora* was seized on an emergency basis after he indicated to a healthcare hotline operator that he was suicidal and made remarks suggesting that he might kill himself at work and take the lives of his co-workers in the process. After he was dispatched to a hospital for an emergency mental health evalua-

tion, the police, without a warrant, seized the many (lawfully-possessed) guns they had found in his home for safekeeping. The plaintiff argued that this step was logically unjustified, given that the state's involuntary commitment statute did not authorize his release if, as was feared, he posed a danger to himself or others. The Fourth Circuit rejected this contention:

> This argument implies that once police transferred Mora to a psychiatrist, the responsibility for ensuring public safety passed to the psychiatrist as well; the officers could wash their hands of the situation, their job done. But protecting public safety is why police exist, and nothing in Maryland's involuntary admission statute supports the remarkable suggestion that, by handing Mora over to doctors, the officers relinquished authority over the thing for which they are under law chiefly responsible. A psychological evaluation would not change what the officers already knew: that Mora was unstable and heavily armed, and a risk to himself and others. …

*Id.* For similar reasons the court rejected the notion that once Mora was on his way to the hospital, the police should have sought a warrant before seizing his guns, as there was no longer an emergency justifying warrantless action.

> [W]e are unwilling to say the emergency that brought on the seizure disappeared as quickly as Mora would have us think. The officers were entitled to take into account the nature of the threat that led to their presence at the scene, and the corroborating fact of a verita-

ble fortress of weapons and ammunition they found when they arrived. Moreover, in the rapidly unfolding series of events, the officers could not be sure of exactly what it was they confronted. They had no way of knowing whether confederates might possess access to Mora's considerable store of firearms, or whether Mora himself might return to the apartment more quickly than expected and carry out some desperate plan. …

*Id.*

To be sure, there are significant differences between the facts presented in *Mora* and those presented here: Sutterfield never threatened anyone's life but her own, and so far as the record reveals, she possessed just one (real) gun rather than the "veritable fortress of weapons and ammunition" that the police discovered in *Mora*. But the essential point that the Fourth Circuit made in *Mora* is nonetheless relevant here: The police officers who took Sutterfield into custody had a legitimate public safety interest in *her* health, and although they knew that she would be evaluated by mental health professionals pursuant to section 51.15, they could not be sure what would happen next. It was natural, logical, and prudent for them to believe that her firearm should be seized for safekeeping until such time as she was evaluated and it was clear that she no longer posed a danger to herself.[11]

---

[11]  In the event professionals determined that Sutterfield indeed did pose a danger to herself (or others), one consequence of that finding might have been a judicial order prohibiting her from possessing a firearm and directing the seizure of any firearm owned by her. *See* Wis. Stat. § 51.20(13)(cv)(1).

An equally persuasive justification for the seizure of the gun is the one articulated by Sergeant Berken, that the gun might otherwise be accessible to Sutterfield's son during her absence from the house. The police knew that Sutterfield had a son, but they did not know where he was or whether he might have unsupervised access to Sutterfield's home in her absence. Neither did they know, nor could they have known, how long Sutterfield might be detained nor who might have access to the house during that time. It was arguably prudent to remove the gun from the home as a prophylactic measure during Sutterfield's absence. *Cf. United States v. Harris*, 2014 WL 1356822, at *3 & n.4 (8th Cir. Apr. 4, 2014) (community caretaking doctrine justified temporary seizure of gun seen falling out of pocket of man sleeping in bus terminal, given danger exposed and unguarded firearm posed to public, including risk that a child or devious adult might take the gun). There may have been alternatives, but removing and securing the firearm was an obvious and reasonable measure. One need only imagine the public outcry that would have taken place had the police left the gun where it was and had Sutterfield returned home and then used the gun to take her own life, or had her son taken the gun in her absence and used it to harm himself or others, to see the wisdom in what the police did.

Milwaukee does have in place a procedure, which Sutterfield ultimately used, to regain possession of the gun. No issue is raised here as to the adequacy of that procedure. So we are presented solely with a dispute as to the seizure of the gun at the time Sutterfield was taken into custody and transported for evaluation, rather than questions as to the timeliness and

efficacy of the process that Sutterfield ultimately employed to obtain the return of her gun.

Finally, Sutterfield has argued that even if the seizure of the gun was lawful, the seizure of her concealed-carry licenses was not. But on the facts presented to us, the seizure of the licenses does not present a separate issue. We can imagine that Sutterfield might have been able to obtain another firearm while she was awaiting the return of the seized gun; she may even have owned other guns not seized by the police. The seizure of the licenses did not preclude her from possessing those guns, however. They simply prevented her from carrying those weapons in a concealed fashion in various states other than Wisconsin. Sutterfield has not developed any argument as to the ways in which her temporary inability to carry a concealed weapon in other states, as distinct from the seizure of her firearm, harmed her. On this record, any injury inflicted by the seizure of the licenses was de minimis, and we need not explore this issue further.

We began this discussion with an assumption that, if the search of the case containing the gun was conducted in violation the Fourth Amendment, the seizure of the gun itself was also contrary to the Fourth Amendment. But there are, as we have gone on to note, powerful arguments in favor of the temporary seizure of the gun as a prudential measure; these arguments figure prominently in our qualified immunity analysis below. For now it bears emphasis that our assumptions that the search for and seizure of the gun were inconsistent with the Fourth Amendment are just that—assumptions. We reserve a firm ruling on the merits of these issues for a case in which the arguments are better developed and supported.

### 2. Second Amendment

Sutterfield has separately argued that the seizure of her firearm violated her Second Amendment rights. She reasons that apart from her property interest in the gun, the Supreme Court's decisions in *District of Columbia v. Heller*, *supra*, 554 U.S. 128 S. Ct. 2783, and *McDonald v. City of Chicago, Ill.*, *supra*, 130 S. Ct. 3020, recognize her right to possess a gun in the home for purposes of self-defense. *See also Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (2-1 decision) (holding that Second Amendment right to bear arms for self-defense extends beyond home), *reh'g en banc denied over dissent*, 708 F.3d 901 (7th Cir. 2013). The seizure deprived her of that right in addition to her Fourth Amendment right not to have the gun taken from her without probable cause, she reasons.

Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention. *Heller* itself recognizes that the right to possess a firearm secured by the Second Amendment "is not unlimited." 554 U.S. at 626, 128 S. Ct. at 2816. The Eighth Circuit, having concluded that the plaintiff's Fourteenth Amendment right to due process was violated by the authorities' refusal to return his gun once the legal basis for seizing it had evaporated, found no independent violation of the plaintiff's Second Amendment right to possess the gun. *Walters v. Wolf*, 660 F.3d 307, 317-18 (8th Cir. 2011). Although the court confined its ruling to the facts and did not rule out the possibility that, under different circumstances, the seizure

of a gun might constitute a Second Amendment violation, *id.* at 318, it reasoned that where the plaintiff had been able to vindicate his interest in "a meaningful procedural mechanism for return of his lawfully seized firearm," by way of the due process clause, *id.* at 317, the seizure of one particular firearm did not otherwise interfere with his Second Amendment interests: "The defendants' policy and action affected *one* of Walter's firearms, which was lawfully seized. The defendants did not prohibit Walters from retaining or acquiring other firearms." *Id.* at 318 (emphasis in original). *Cf. Houston v. City of New Orleans*, 682 F.3d 361, 363-64 (5th Cir. 2012) (per curiam) (remanding to district court for determination whether state law permitted state officials to retain plaintiff's handgun following entry of *nolle prosequi* on charges against him, as determination that state law compelled return of gun would render it unnecessary to decide whether defendants violated plaintiff's Second Amendment rights by refusing to return gun to him); s*ee generally* John L. Schwab & Thomas G. Sprankling, *Houston, We Have a Problem: Does the Second Amendment Create a Property Right to a Specific Firearm?*, 112 COLUM. L. REV. SIDEBAR 158 (2012) (agreeing that Second Amendment does not encompass right to possess a specific firearm, criticizing lack of analytic rigor in judicial decisions to date on this subject, and proposing cautious, minimalist approach to determining scope of Second Amendment).

This is not an issue that we have addressed and it is not one that we will address here. Beyond a bare-boned contention that the seizure violated her Second Amendment rights, Sutterfield has not developed a cogent argument as to the reach and application of the Second Amendment in the law enforcement

and community caretaking context. The issue is a sensitive one, as it implicates not only the individual's right to possess a firearm, but the ability of the police to take appropriate action when they are confronted with a firearm that may or may not be lawfully possessed, and which, irrespective of the owner's right to possess the firearm, may pose a danger to the owner or others.

We do reiterate that Milwaukee has a procedure by which a citizen whose lawfully-possessed gun has been seized may seek its return. Sutterfield availed herself of that procedure and has not contested its adequacy in this appeal. This too counsels against addressing the merits of Sutterfield's Second Amendment claim. *Cf. Houston*, 682 F.3d at 364.

F.  Qualified Immunity

Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982); *see also, e.g.*, *Volkman v. Ryker*, 736 F.3d 1084, 1089-90 (7th Cir. 2013).

Sutterfield concedes that all but one of the police actions at issue in this case were discretionary acts that are potentially subject to qualified immunity. The one action she asserts was not discretionary was the seizure of her person pursuant to section 51.15. This assertion is based largely on Hewitt's and Berken's testimony that they were going to execute the statement of emergency detention by taking Sutterfield into custody regardless of what transpired when they located her and gained access to her home. Sutterfield reads this testimony

as proof that the decision to seize her was not discretionary. She contradicts herself on this point, however, when she argues that the police officers who seized her should have realized that section 51.15 itself is flawed—the implication being that they could and should have declined to implement the statement of emergency detention. No matter. As we discussed earlier, Sutterfield has not preserved a challenge to the legality of her seizure. Whether or not that act was potentially subject to a qualified immunity defense is therefore a question we need not address.

The defense clearly does apply to the other acts to which Sutterfield has preserved a challenge—the warrantless entry into her home, the search of the locked compact disc case, and the seizure of the gun and licenses. For the reasons that follow, given the broad sweep that Wisconsin courts have given to the community caretaking doctrine, we agree with the district court that the police could have thought each of these actions was permissible in order to protect Sutterfield's well-being.

One point as to the relevance of Wisconsin cases must be disposed of at the start. Sutterfield contends that because Wisconsin precedent would not bind this court on the merits of her claims, and because in particular we, in contrast to the Wisconsin courts, have refused to extend the community caretaking doctrine to anything but automobile searches, the Wisconsin cases are irrelevant in terms of whether the defendants have qualified immunity. Not so. Although it is true that in this court, the Wisconsin cases have persuasive value only on the merits of Sutterfield's federal claims, they remain relevant as to what the defendants might have thought the law, including the federal constitution, permitted them to do in

executing the emergency statement of detention. Federal courts do not possess exclusive authority to decide Fourth Amendment issues; state courts resolve such issues every day. *See Pompey v. Broward Cnty.*, 95 F.3d 1543, 1550 (11th Cir. 1996) ("The state courts are courts of equal dignity with all of the federal 'inferior courts'—to use the Framers' phrase—and state courts have the same duty to interpret and apply the United States Constitution as we do."). In the absence of a controlling decision by the United States Supreme Court, the Wisconsin cases are thus as relevant as our own precedents in evaluating what a Milwaukee police officer might have thought the law permitted in responding to a report that the occupant of a private dwelling was in danger of harming herself. *See Burgess v. Lowery*, *supra*, 201 F.3d at 945-46; *see also Stanton v. Sims*, 134 S. Ct. 3, 5, 7 (2013) (per curiam) (considering decisions of both federal and state courts in concluding it was not clearly established that warrantless entry into home in hot pursuit of person believed to have committed misdemeanor offense was contrary to Fourth Amendment); *Barnes v. Zaccari*, 669 F.3d 1295, 1307 (11th Cir. 2012); *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 144-45 (1st Cir. 2001); *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999).[12]

---

[12]   It is worth noting that even if we were reviewing the Wisconsin decisions we are about to discuss—both of which are criminal cases—pursuant to petitions for a writ of habeas corpus, *see* 28 U.S.C. § 2254, the conflict between those decisions and our own decision in *Pichany* as to the appropriate scope of the community caretaker exception would not by itself support habeas relief. Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, the state decisions would have to be

(continued...)

Although our decision in *Pichany* refused to extend the
community caretaking exception recognized by the Supreme
Court in *Cady* beyond the automobile context, Wisconsin
courts have given the exception a much broader reach. They
have relied on the community caretaking doctrine to justify
warrantless entries into the home when the police have reason
to believe that the occupant may be injured or otherwise in
danger of harm.

The appellate court's decision in *State v. Horngren*, 617
N.W.2d 508 (Wis. Ct. App. 2000), applied the doctrine in the
context of a reported suicide threat to hold that a warrantless
entry into and search of a home under circumstances much like
those presented here was lawful. The police in that case had
received a call reporting that Horngren had threatened to kill
himself. While en route to Horngren's apartment, the respond-
ing officers were further advised he had a history of prior
suicide threats (and had once been committed to a mental
health facility for such a threat), and that he had (lawfully)
possessed multiple firearms. When they arrived at the apart-
ment, the officers knocked on his door and discovered it was
unlocked. When one of the officers leaned on the door, causing
it to open slightly, a naked Horngren rushed to the door and
tried to push it shut without success. The officers forced the

---

[12] (...continued)
"contrary to, or involve[ ] an unreasonable application of, clearly estab-
lished Federal law, as determined by the *Supreme Court of the United States*,"
in order to support the issuance of a writ. § 2254(d)(1) (emphasis ours). *See
Marshall v. Rodgers*, 133 S. Ct. 1446, 1450-51 (2013) (per curiam); *Williams v.
Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000); *Morales v. Boat-
wright*, 580 F.3d 653, 662-63 (7th Cir. 2009).

door open, placed Horngren in handcuffs, and then conducted a sweep of the apartment in order to determine whether there was someone else present, as Horngren told them there was. During that sweep, they came across marijuana that was in plain view. That discovery (along with drug paraphernalia found pursuant to a subsequent consensual search of the premises) led to criminal charges against Horngren. He sought to suppress the marijuana and drug paraphernalia on the ground that the warrantless entry into and sweep of his home, which resulted in the discovery of the marijuana, violated the Fourth Amendment. The Wisconsin appellate court, however, held that the entry and sweep were consistent with both the Fourth Amendment and the corresponding provision of Wisconsin's constitution, as the police were not engaged in traditional law enforcement when they entered Horngren's home but rather community caretaking. *Id.* at 511. The court applied a two-part test to determine whether the community caretaker exception to the warrant requirement applied, first confirming that the police were engaged in bona fide community caretaking activity, that is, activity "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *id.* (internal quotation marks and citations omitted), and second, weighing the public good served by the actions of the police against the level of intrusion on the individual's privacy, and determining in light of that balance whether the police action was reasonable on the facts and circumstances of the individual case, *id.*

Citing section 51.15, the court observed that the police had a legitimate interest in Horngren's well-being, given the reported suicide threat, that permitted them to enter the home

against Horngren's consent. "Truly, the motivation in investigating the complaint was to render aid, not to investigate any criminal activity." *Id.* at 511. Given the potential danger to Horngren's well-being, the public interest also supported the degree of intrusion upon Horngren's privacy. *Id.* at 512. Preventing an individual from taking his own life was of the "utmost public concern." *Id.* The circumstances were also genuinely exigent: the police were acting in response to an emergency call and to the circumstances presented to them; and no less intrusive means of responding to the exigency were feasible under the circumstances.

The sweep of the premises was likewise permissible: the court noted that a protective sweep is authorized to ensure the safety of the police and others present on the premises. *Id.* at 513. Horngren had indicated to the officers that a girl was present but she had not shown herself despite the officers' struggle with him; it would have been unreasonable, in the court's view, for the police not to check on her status. And because they discovered the marijuana in plain view during the check for the girl, the court concluded that the marijuana should not be suppressed. *Id.* at 513-14.

In *State v. Pinkard*, 785 N.W.2d 592 (Wis. 2010), the Wisconsin Supreme Court—applying both the Fourth Amendment and its Wisconsin counterpart—likewise sustained the warrantless entry into, and sweep of, a dwelling, this time in response to a report suggesting that the occupants were unconscious, possibly as the result of drug abuse. There, a police officer had received a tip that two people were seen sleeping in a residence next to cocaine, money, and a digital

scale; the back door to the residence was reportedly standing open. Police responded to the tip, saw that the back door (the main entrance to the residence) was indeed standing three-quarters of the way ajar, knocked and announced themselves to no response, and entered the dwelling. Upon looking around, they saw an open bedroom door and two people sleeping inside of that bedroom. They announced themselves loudly a second time to the occupants, and after again receiving no response, entered the bedroom. There, in plain view, they observed both powder and crack cocaine, marijuana, and a digital scale. Ultimately, they had to physically shake one of the occupants—Pinkard, the defendant—awake, after which they arrested him for possession of the drugs.[13]

The court held that the warrantless entry into the defendant's home constituted a legitimate exercise of the community caretaking function of the police. Consequently, the drugs and drug paraphernalia discovered in the home were admissible against Pinkard at trial.

At the outset, the court expressly rejected Pinkard's contention that the community caretaking exception first recognized by the United States Supreme Court in *Cady* was limited to searches of automobiles. The court instead declared that the community caretaking function may also justify the warrantless entry into a home, depending on the totality of the

---

[13] They subsequently found a gun underneath the mattress. However, the trial court granted the defendant's motion to suppress the gun, finding that searching beneath the mattress exceeded the bounds of the police officers' community caretaking function. That ruling was not appealed by the State. 785 N.W.2d at 596.

circumstances confronting the police. *Id.* at 598-601. Whether the police were serving a bona fide community caretaking function when they entered Pinkard's home presented a "close" question, in the sense that the information reported to the police not only raised a legitimate concern for the occupants' safety but also implicated the occupants in criminal activity. *Id.* at 603. But the court declined to take a narrow view of the community caretaking exception and limit the exception only to cases in which the sole motivation for police action is the safety and well-being of a dwelling's occupant; community caretaking and law enforcement objectives are not mutually exclusive, the court reasoned. *Id.* at 604-05.[14]

With that point settled, the court considered whether the community caretaker exception justified the warrantless entry into and sweep of Pinkard's home. After ascertaining that a Fourth Amendment search or seizure had occurred, *id.* at 602, the court engaged in the same two-part inquiry that the appellate court had in *Horngren*: (1) were the police exercising

---

[14]   By contrast, some scholars have advocated for a rule conditioning application of the community caretaking doctrine on evidence that the police were animated primarily or solely by a community caretaking purpose, as opposed to a criminal law enforcement purpose, when they took warrantless action. *See* Dimino, 66 WASH. & LEE L. REV. at 1528-40; Decker, 89 J. CRIM. LAW & CRIMINOLOGY at 510-12; *cf. People v. Mitchell*, 347 N.E.2d 607, 609 (N.Y. 1976) (finding warrantless entry into defendant's hotel room to be justified under emergency aid doctrine, in part because police had no motive to apprehend and arrest defendant or to seize evidence), *abrogated by Brigham City*, 547 U.S. at 404-05, 126 S. Ct. at 1948 (in emergency aid situation, "[t]he officer's subjective motivation is irrelevant.").

a bona fide community caretaking function, and, if so, (2) whether the public interest outweighed the intrusion upon the privacy of the individual, such that the officers' exercise of their community caretaking function was reasonable. *See id.* at 601.

The court answered these questions in the affirmative. In this case, the police had a legitimate concern for the well-being of the unconscious, unresponsive occupants of the house. *Id.* at 603-04. Balancing the public interest served by police action against the intrusion on Pinkard's privacy interests, *id.* at 605, the court concluded that the former outweighed the latter: it was possible that the occupants may have overdosed on drugs and thus required urgent medical assistance, and the fact that the door to the residence was left ajar suggested that the occupants were unable to look out for their own interests, *id.* at 606-08. In short, given the totality of the circumstances, the entry into the house and then the open bedroom constituted a reasonable exercise of the police officers' community caretaking function. *Id.* at 608. And as the drugs were observed in plain view in the bedroom, they were admissible against the defendant at trial. *Id.*[15]

---

[15]    *See also*, *e.g.*, *State v. Ziedonis*, 707 N.W.2d 565 (Wis. Ct. App. 2005) (sustaining warrantless entry into defendant's home—wherein both unlawfully possessed firearms and marijuana were observed in plain view—on basis of community caretaker doctrine, where police, in attempt to solicit defendant's help in corralling his dogs, which were running loose outside his residence and causing a disturbance in the middle of the night, saw that back door of defendant's home was open by several inches, and defendant did not respond to repeated and prolonged efforts to announce

(continued...)

Based on these decisions, the officers who forcibly entered Sutterfield's home could have believed that their entry was justified by the community caretaking doctrine as understood and applied by the Wisconsin courts. They had a section 51.15 statement of emergency detention to execute based on the suicidal remark Sutterfield had made to her physician earlier that day. Sutterfield would not voluntarily admit the officers to her home; and her behavior, if not erratic, did nothing to allay the concerns raised by the physician's report to the police. The entry was made in a bona fide effort to assure Sutterfield's well-being; there has never been any suggestion that the police were acting for a law enforcement motive. In relevant respects, the circumstances of this case, as we have noted, were substantially similar to the circumstances that the appellate court in *Horngren* found sufficient to justify a forcible entry. Based on both that precedent and *Pinkard*, the police reasonably could have thought that the public interest in safeguarding Sutterfield's life outweighed the intrusion into the privacy of her home.

---

[15] (...continued)

their presence and have him come to door); *State v. Ferguson*, 629 N.W.2d 788 (Wis. Ct. App. 2001) (sustaining warrantless entry into defendant's bedroom and closet—wherein marijuana plants were discovered—as legitimate exercise of community caretaker function, where occupants of bedroom did not respond to officers' repeated knocks and yells, there were multiple indicia elsewhere in the apartment that juveniles had been drinking substantial amounts of alcohol, and defendant had not been seen at work in several days; officers were justified in both entering bedroom and checking closet to make sure there was no one inside who needed assistance).

The decision to forcibly open and search the locked compact disc case discovered in the course of the protective sweep presents a closer question in terms of the officers' qualified immunity, just as it does on the merits of Sutterfield's Fourth Amendment claim. No Wisconsin case that has been cited to us or that we have found has relied on the community caretaking doctrine to justify any search of the premises more intrusive than the sort of limited, protective sweep envisioned by *Buie*—that is, a search of places within the home that another person might be found. 494 U.S. at 335-36, 110 S. Ct. at 1099. The gun, having been secured within a locked, opaque case, obviously was not in plain view, in contrast to the drugs found in both *Horngren* and *Pinkard*. Opening the case was a substantial step beyond the standard protective sweep, and constituted a more substantial intrusion on Sutterfield's privacy interests in her personal effects.[16]

Even so, a police officer might have thought the search of the case justified by the circumstances presented to him and the broader articulation of the community caretaking doctrine

---

[16] *Compare State v. Toliver*, No. 2010AP484-CR, 2011 WL 228889 (Wis. Ct. App. Jan. 26, 2011) (nonprecedential decision) (community caretaker doctrine justified officer's decision to open purse and look for identification, where officer was responding to report of possible suicide attempt and arrived to discover purse left unattended in common area outside of duplex), *with State v. Kuczor*, No. 2009AP1077-CR, 2009 WL 3103749 (Wis. Ct. App. Sep. 30, 2009) (nonprecedential decision) (community caretaker doctrine did not justify warrantless search of defendant's duffel bag by deputy who responded to defendant's one-car accident, notwithstanding both accident and defendant's strange behavior, where there were no particular facts that warranted intrusion into bag and deputy was simply on a fishing expedition.

by the Wisconsin Supreme Court in *Pinkard*. The two-part inquiry set forth in *Pinkard* asks first whether the police acted for a community-caretaking purpose and second whether, on the totality of the circumstances, the public interest served by the police action outweigh the intrusion upon the individual's privacy. Although we have not found any Wisconsin case that invoked the community caretaking doctrine to sustain a search akin to that here, neither have we found anything that would preclude this result when the search is conducted for purposes of protecting someone's safety or well-being. We can imagine, for example, that in the case of a reported suicide attempt by drug overdose, a Wisconsin court might sustain the search of someone's medicine cabinet, nightstand, or purse in an effort to locate drugs that the individual has taken or might take. *See Stricker v. Tp. of Cambridge*, *supra*, 710 F.3d at 362 (sustaining the warrantless search of home, including drawers and cabinets, where drug overdose of occupant had been reported and such search might yield clues as to what occupant had ingested). Indeed, the U.S. Supreme Court's analysis in *Brigham City* theoretically might recognize such a situation as an emergency that justifies a warrantless search of this kind.[17]

---

[17] *See State v. Hooper*, No. 2009AP575-CR, 2009 WL 4806889 (Wis. Ct. App. Dec. 10, 2009) (nonprecedential decision) (finding search of defendant's dresser justified by community caretaker exception, where defendant had summoned emergency assistance with report that she had taken cocaine and was having difficulty breathing, emergency medical personnel arrived to find her incoherent and unresponsive, medical personnel instructed police to look around defendant's apartment for any harmful substance defendant might have ingested, officer saw a mirror on top of dresser with powdery residue on it, and officer looked in dresser drawer and discovered cocaine).

Here, there is no question that the police searched the compact disc case not for law enforcement purposes but rather out of a safety concern. And the police might reasonably have concluded that although forcing open the case was a significant intrusion upon Sutterfield's privacy, it was amply justified by the public interest in protecting both her safety and well-being as well as that of anyone else who either lived with her or had access to her home, including in particular a minor. Given the nature of Sutterfield's threat to harm herself and her physician's report that she likely possessed a gun, police had reason to look for any firearm that Sutterfield might use to harm herself. And although there was nothing but Floriani's hunch that suggested there might be a gun inside of the case, the locked case was a logical place to look for a gun.

For essentially the same reasons, we believe that a reasonable police officer might have thought, upon discovery of the gun, that he was authorized by his community caretaking function to seize the gun for safekeeping. Given the breadth that the Wisconsin courts have given to the community caretaking doctrine, and the fact-specific balancing of public versus private interests in which they engage when the police take action as they did here to safeguard an individual's well-being, a police officer might think he would be authorized to seize an obvious implement of harm from an individual who has threatened to kill herself and is being taken into custody pursuant to section 51.15 for an emergency mental health evaluation. Regardless of Sutterfield's legal right to possess the gun, there is an obvious and powerful logic and prudence supporting the decision to take the gun into police custody. *See*

*Florida v. J. L.*, 529 U.S. 266, 272, 120 S. Ct. 1375, 1379 (2000) ("Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions.").[18] The police knew that Sutterfield had threatened to harm herself and was potentially in a volatile state of mind, that her psychiatrist believed she was in need of an intervention, and that, pursuant to section 51.15, Sutterfield was facing a short-term commitment for evaluation and potentially a longer term commitment if professionals confirmed she indeed posed a danger to herself. They had no idea whether she would be released within a day, a week, or a month. And they had no idea who, in the meantime—including her son—might have access to her home and to the unattended gun. Seizing the gun might not have been the only step they could have taken to prevent the gun from being misused or falling into the wrong hands, but it was a rational and defensible step. *See Mora v. City of Gaithersburg, supra*, 519 F.3d at 227-28 (sustaining seizure of individual's guns and ammunition for public safety, after individual had been seized for involuntary mental health admission for making remarks indicating he might kill himself and possibly his co-workers); *United States v. Harris, supra*, 2014 WL 1356822,

---

[18]  *See also State v. Kucik*, No. 2009AP933-CR, 2010 WL 4633082, at *11 (Wis. Ct. App. Nov. 16, 2010) (nonprecedential decision) (Fine, J., concurring) (where defendant had been detained pursuant to section 51.15 after assaulting cousin and threatening life of both cousin and aunt—including threat to put a bullet in aunt's head—and guns were seen in plain view in glass-fronted gun cabinet, it was reasonable for officers to take custody of defendant's guns as safety measure in exercise of their community caretaking function, given that they did not know how long defendant would otherwise be separated from his guns).

at * 3 & n.4 (sustaining temporary seizure of gun falling out of sleeping man's pocket).

For all of these reasons, the defendants are entitled to qualified immunity for the warrantless entry into Sutterfield's home, the search of the locked compact disc case, and the temporary seizure of the gun found inside of the case. The police were faced with a difficult situation in which they had reason to believe, based on her physician's report, that Sutterfield might pose a danger to herself, they were implementing an emergency detention of her person for evaluation pursuant to section 51.15, and they were logically attempting to find the firearm they had reason to believe Sutterfield possessed and to secure that firearm while Sutterfield was undergoing a mental health evaluation. Notwithstanding the uncertainty as to which legal framework best applies to the warrantless actions of the police in these circumstances, the police could have believed that Wisconsin precedents, if not the federal cases, authorized them to take these actions in order to protect Sutterfield's well-being as well as the well-being of anyone else, including her son, who might have access to her home in her absence.

### III.

Based on the Supreme Court's decision in *Brigham City* and this court's decision in *Fitzgerald*, we conclude that the warrantless entry into Sutterfield's home was justified. Under the circumstances confronting the defendant police officers, they had an objectively reasonable basis for believing that Sutterfield posed an imminent danger of harm to herself; the circumstances thus constituted an emergency which dispensed with the need for a warrant under the exigent circumstances

exception to the Fourth Amendment's warrant requirement. Alternatively, even if the entry into Sutterfield's home was inconsistent with the Fourth Amendment, a reasonable person would not have known that the entry violated Sutterfield's clearly established rights; the officers would therefore be entitled to qualified immunity on the unlawful entry claim. Similarly, although we have assumed *arguendo* that both the search of the compact disc case in Sutterfield's home and the seizure of the (lawfully-possessed) gun found inside of that case were contrary to the Fourth Amendment, we conclude that the defendant officers are entitled to qualified immunity on the unlawful search and seizure claims. We do not address Sutterfield's summary contention that the officers' seizure of her person for purposes of an emergency mental health evaluation pursuant to Wisconsin Statutes section 51.15 was contrary to the Fourth Amendment, as she has not adequately preserved that argument. Neither do we address Sutterfield's contention that the seizure of her lawfully-possessed handgun violated her Second Amendment right to possess a firearm for the purpose of self-defense, as Sutterfield has not adequately developed and supported that contention, nor has she shown any defect in the available means of regaining possession of her gun from the authorities.

The judgment of the district court is AFFIRMED.

MANION, *Circuit Judge,* concurring.

I am pleased to join the court's thorough and scholarly opinion. After examining many of the problems, the court reaches the correct conclusion that the actions of the police officers were well within the shelter of qualified immunity provided by state and federal judicial opinions interpreting and applying the Fourth Amendment. I write separately only with the hope of encouraging legislatures to provide for a judicially-issued civil warrant process that would authorize law enforcement to enter someone's home when there is probable cause to believe that she poses a risk to herself or others because of mental illness.

In this case we are able to determine that exigent circumstances justified the police forcing their way into a private dwelling in order to protect the owner. But there was no other legal authority to enter her home against her will.

I recognize that allegations of mental health risks can have dramatic implications on privacy, liberty, and property rights. After receiving some due process, those determined to be mentally ill may lose certain fundamental rights, the same as a criminal. *See* 18 U.S.C. § 922(d); Jana R. McCreary, *"Mentally Defective" Language in the Gun Control Act,"* 45 CONN. L. REV. 813 (2013). What we do not seem to have is a law that strikes a balance that protects those rights at least as much as it does the rights of the criminally accused, while still allowing for swift and effective responses by the police. Here, exigent circumstances enabled the police to bypass some legal barriers. But in very limited circumstances, as here, when the police are positioned to enter a private home against the owner's will, it

would be very helpful, for example, if the state legislature of Wisconsin were to amend Wis. Stat. § 51.15 to allow the option of having what in this case is called the "Statement of Emergency Detention" approved by a judge. Then, the document could be a sort of civil warrant on par with an arrest warrant. It would allow the police to rely on the document to enter the home when the owner-occupant is believed to pose a risk to herself or others. By providing the police with the ability to obtain a civil warrant prior to entering the home of such a person, they will have a more clearly established method that is safely within the confines of the law and which protects personal property and privacy.

Because the court resolved the issues before it consistent with controlling precedent, I fully concur.